[Crim. No. 5725. Second Dist., Div. Two. Feb. 8, 1957.]

THE PEOPLE, Respondent, v. HOMER C. MILLS et al.,
Appellants.

394

. Homer C. Mills and J. Frank Cavanaugh, in pro. per., for Appellants.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

ASHBURN, J.—Convicted on 10 charges of violation of the Corporate Securities Act, two counts of grand theft and one accusation of conspiracy to commit those crimes, defendant Mills appeals from the judgment and from an order denying his motion for new trial. His codefendant, Cavanaugh, was jointly charged with him and convicted on the conspiracy count and three counts of violation of the Corporate Securities Act. He appeals from an order granting him probation (Pen. Code, § 1237, subd. 1) and from an order denying his motion for new trial. Each defendant also attempts to appeal from an order denying his motion in arrest of judgment. The conspiracy charge originally included one Paul H. Kroger, as did certain other counts of the information. Near the close of the People's case he was dismissed on motion of the prosecution because of insufficiency of the proof against him. The appeals will be considered separately for reasons which will be readily apparent as the discussion progresses.

Mills raises three major contentions, (1) former jeopardy, (2) unlawful search and seizure, and (3) insufficiency of the evidence.

 As to former jeopardy. At a previous trial upon the same information the judge, when he resumed the bench for the afternoon session, stated that the prosecutor and police lieutenant William C. Hull had that morning been guilty of misconduct of such grievous nature that a motion for mistrial would be entertained if defendants should elect to make one, pointing out that they alone could take advantage of the situation. Defendants promptly made the motion and it

was granted. The consent inherent in such a motion precludes a later claim of double jeopardy. (*People* v. *Kelly*, 132 Cal.App. 118, 121-122 [22 P.2d 526]; *People* v. *Baillie*, 133 Cal.App. 508, 513 [24 P.2d 528]; *People* v. *Agnew*, 77 Cal.App.2d 748, 760 [176 P.2d 724]; *People* v. *Finch*, 119 Cal.App.2d Supp. 892, 898-899 [258 P.2d 1124].)

In an attempt to neutralize the effect of that general rule Mills asserts that his motion was made under duress brought about by the fear of contempt should he decline to follow the judge's suggestion. In his testimony defendant referred to himself as a retired lawyer (he had been disbarred, *Mills* v. *State Bar*, 6 Cal.2d 565 [58 P.2d 1273]), and "expert lawyer," and further said, "I have had a great many years' experience in the practice of law, previous to that time, and since that time, attending to my own affairs." His conduct of the trial in propria persona, and his briefs on appeal, show that he has had adequate court experience and is at home in that field. The claim of fear of contempt does not possess a semblance of merit. The court did not err in denying the plea of double jeopardy.

The claim of an unlawful search and seizure presents a serious question. Count 14 of the information charges Mills with violation of the Corporate Securities Act (Corp. Code, § 26104, subd. (a)) through sale and issuance to William C. Hull of shares of stock in Searchlight Uranium Corporation, a Nevada corporation, without having applied for or secured from the Commissioner of Corporations of the State of California a permit to do so. Hull, a lieutenant of police, posing as a prospective investor, agreed to buy from Mills 30,000 shares of stock in said corporation for the sum of $3,000. Mills represented himself to be sole owner of the corporation and the Blossom Mine which it operated. He gave Hull a written memorandum of the sale, which is set forth in the margin.[1] That was on December 16, 1954. On

---

[1] "December 16th, 1954.
"Mr. W. C. Hull,
Statler Hotel,
Los Angeles, Calif.
"Dear Mr. Hull:
"In consideration of $3,000.00 receipt of which is hereby acknowledged, you are to have 10% of the smelter checks as received from the Blossom Mine at Searchlight, Nevada, until you shall have received back a total of $6,000.00, which must be earned and paid back within one year from December 17th, 1954. After you have received back said $6,000.00, within one year as above stated, your percentage in the production from the mine ceases but in lieu thereof you will own outright

the following day Hull took a witness with him to Mills' office in the Clark Hotel in Los Angeles, and there delivered to Mills a certified check for $3,000, payable to Hull but not endorsed. Mills handed him a certificate of stock (No. 69) issued in favor of Hull and wife as joint tenants. It was signed by Mills as president, and Kroger as secretary. While Mills was examining the check Hull handed him an identification card showing his official status, told him he was under arrest for violation of the Corporate Securities Act, took possession of the check and kept the stock certificate. Hull knew Mills had no permit to sell stock in California; he had representatives of the Division of Corporations waiting outside, Messrs. Stern and Naslund. Following the arrest of Mills, Lieutenant Hull called into the room the investigators just mentioned and two police officers who were also waiting. Mills had two rooms in the hotel, one of which was used as an office and the other as a bedroom. Off the office was a small closet-like room or recess. It will be noted that Hull had in his possession all the knowledge and evidence he needed to make a case on the sale of the stock to him. He knew there was no corporate permit; he had the written contract of sale, the stock certificate and the check; he also had a witness to the transaction, Mrs. Asdell, a police woman; and Mills in her hearing had told Hull that he owned all the stock in the corporation and in effect that the proceeds of the same would be used for corporate purposes, thus making a case in which the statutory exemption concerning sales of one's own stock would not apply (authorities, *infra*). With respect to the crime for which Mills was arrested, Lieutenant Hull had no occasion to make any search whatever.[2]

without further consideration 30,000 shares of Searchlight Uranium Corporation which are to be assigned and transferred and delivered to you on this date, and said shares shall be fully paid and non-assessable.

''You are hereby given a 60 day option to increase your holdings in said transaction on the same basis with an additional $5,000.00 and with the same results and benefits, or in any amount up to $5,000.00. All shipments go to U.S. Smelting Refining and Mining Co., at Salt Lake City, Utah. and you will be notified when each shipment is made.

''Sincerely,

[signed] Homer C. Mills

Homer C. Mills.''

[2]If, as investigator Stern testified, Lieutenant Hull told defendant he was arrested for grand theft as well as violation of the Corporate Securities Act that would not enlarge the scope of a legitimate search, for Hull does not claim to have had any ground for charging grand theft in the transaction with him, and, indeed, the search did not bring forth any such charge with respect to that deal. Of course the results of the search, considered alone, could not justify the fact of search or

He had no search warrant and it is not claimed that Mills consented to the search.

What happened in that connection is told by Lieutenant Hull in his testimony: "I told the officers that were with me at that time and the investigators from the Division of Corporations that . . . Jack Stern and Naslund from the Division of Corporations, and Lorrettivich and James and one or two other officers from the Bunco Division, Detective Bureau, Los Angeles Police Department. . . . I told Mr. Stern and Mr. Naslund and Officer Nelson and James and the other officers that I wanted the entire office searched as well as the adjoining room. I told them that I was looking for all things having to do with stock, stock promotion, assays, mines, ores, letters, letters that showed, that would reveal other investors, books and ledgers and various papers that would pertain to stock promotion, stock activities, and to call my attention to anything they found, and to let me see, and see where it was before they removed it and we would obtain— I directed one of them to obtain two or three cartons, cardboard cartons, and then Mr. Mills was seated there in the office and the various officers and investigators began a search of the premises. . . . Various pieces of— various items were called to my attention and I reached the decision as to whether they were of evidentiary value. . . . Various items were called to my attention. I directed items to be placed in the cartons and other items to be left where they were." The witness further testified that the officers searched through file cabinet drawers, the desk, the table, desk drawers, a correspondence file, all in the front room; that he directed Jack Stern of the Division of Corporations to make a thorough search of the bedroom, which Stern reported he had done. There were at least six persons conducting the search in addition to Lieutenant Hull and Mrs. Asdell. It took 45 minutes or more and produced a large volume of incriminating evidence, somewhere from 500 to 1000 documents. It was not directed toward discovery of the instrumentalities or evidence of the crime for which Mills was arrested, but for evidence of commission of other

---

any arrest based upon what was then discovered. (*People* v. *Brown*, 45 Cal.2d 640, 643-644 [290 P.2d 528].) The burden rests upon the prosecutor to show existence of reasonable cause at the time of arrest and search (*Badillo* v. *Superior Court*, 46 Cal.2d 269, 272 [294 P.2d 23]); there being no showing that Hull had reasonable ground for arrest for grand theft any statement of his that such was the basis for apprehending defendant would not enlarge his right one jot or tittle.

similar crimes. Throughout the search police photographers were present and busily engaged in taking pictures. Before it was started Lieutenant Hull had never heard of the other persons named in the information as victims of Mills' violations of the law; neither had the deputy district attorney who prepared the information; it was based upon facts obtained from the seized documents. The trial judge remarked that "it is true that the evidence shows that the arresting officer and for all we know, any other law enforcement agency, at least the Police Department and the District Attorney's office, knew nothing about these various persons named in counts 1 to 12 until the search and seizure, however, the arrest was a lawful arrest." At the trial the prosecution witnesses who testified to charges other than count 14, which related to the Hull transaction, were persons whose identity and testimony had been discovered and procured through the seized documents. The testimony of each revolved around one or more of the seized instruments.

If the search and seizure were unlawful, the heart of the proof upon each count other than 14 "was a fruit of the poisonous tree."[3] With substitution of names we agree that "if only the fate of the Millses and the Cavanaughs were involved, one might be brutally indifferent to the ways by which they get their deserts."[4] ■ But as our Supreme Court observed in *People* v. *Cahan*, 44 Cal.2d 434, 439 [282 P.2d 905] : "[W]hen consideration is directed to the question of the admissibility of evidence obtained in violation of the constitutional provisions, it bears emphasis that the court is not concerned solely with the rights of the defendant before it, however guilty he may appear, but with the constitutional right of all of the people to be secure in their homes, persons, and effects." And again, at page 446: "Thus, no matter how guilty a defendant might be or how outrageous his crime, he must not be deprived of a fair trial, and any action, official or otherwise, that would have that effect would not be tolerated. . . . Today one of the foremost public concerns is the police state, and recent history has demonstrated all too clearly how short the step is from lawless although efficient enforcement of the law to the stamping out of human rights. This peril has been recognized and dealt with

[3]Mr. Justice Frankfurter in *Nardone* v. *United States,* 308 U.S. 338, 341 [60 S.Ct. 266, 84 L.Ed. 307, 312].

[4]Quoting the same learned Justice in *Harris* v. *United States,* 331 U.S. 145, 156 [67 S.Ct. 1098, 91 L.Ed. 1399, 1409].

when its challenge has been obvious; it cannot be forgotten when it strikes further from the courtroom by invading the privacy of homes." Judge William C. Mathes puts the matter aptly when he says: "We do not forget . . . the eternal truth that the rights of good men are secure only so long as the rights of bad men are also protected."[5]

This search occurred on December 17, 1954, before the police had the benefit of the restraining influence of the Cahan decision, *supra*, which was rendered in April, 1955. The search was wholly exploratory, a quest for evidence of other crimes. Such a procedure has been condemned repeatedly and for many years. *People* v. *Roberts*, 47 Cal.2d 374 [303 P.2d 721], involved an entry by police into defendant's room in an apartment house in response to what they believed to be cries of physical distress. They were at the time in pursuit of some stolen articles, such as radios. When they entered Roberts' room there stood in plain sight a new radio which answered the description of those which had been stolen. They took its number and after checking and finding it to have been stolen they seized it under a search warrant. In rejecting the claim that there had been an unlawful search the court said: "The privilege to enter to render aid does not, of course, justify a search of the premises for some other purpose. An arrest may not be used as a pretext to conduct a general search of one's premises for incriminating evidence, and it has been repeatedly said that where the right to conduct a search is obtained ostensibly for one purpose it may not be used in reality for another. (See *Harris* v. *United States*, 331 U.S. 145, 153 [67 S.Ct. 1098, 91 L.Ed. 1399] ; *Love* v. *United States*, 170 F.2d 32, 33.) Thus the officers in the present case could properly make only that kind of search reasonably necessary to determine whether a person was actually in distress somewhere in the apartment. They could not, for example, ransack the premises or rummage through desk drawers. On the other hand, in the course of conducting a reasonable search they did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. . . . In formulating the rules governing lawful searches and seizures the United States Supreme Court has repeatedly recognized the distinction between the seizure

[5] "A New Order of the Ages: Free Speech and Internal Security," October, 1956, issue of the American Bar Association Journal, page 929.

of evidence which was readily visible and accessible to the officers and that which was uncovered only after a general, unreasonable ransacking of the premises. (See *United States* v. *Lefkowitz*, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775]; *Go-Bart Co.* v. *United States*, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *cf. Harris* v. *United States*, 331 U.S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399], where an intensive search was held reasonable under the circumstances.) The decisions also make a sharp distinction between the seizure of property which is stolen or contraband and property which is inoffending of itself and merely evidentiary. (*Harris* v. *United States*, 331 U.S. 145, 154 [67 S.Ct. 1098, 91 L.Ed. 1399]; *United States* v. *Lefkowitz*, 285 U.S. 452, 465 [52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775]; *Weeks* v. *United States*, 232 U.S. 383, 392-393 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834]; *Gouled* v. *United States*, 255 U.S. 298, 309-310 [41 S.Ct. 261, 65 L.Ed. 647]; *Boyd* v. *United States*, 116 U.S. 616, 623 [6 S.Ct. 524, 29 L.Ed. 746].)

"Applying these principles and distinctions to the facts of the present case we are satisfied that the officers did not act unreasonably or in violation of defendant's constitutional rights." (Pp. 378-380.)

This condemnation of exploratory searches is fully supported by decisions of the United States Supreme Court and other federal and state tribunals; and the exclusion of illegally seized documents extends to other evidence which is derived from those documents directly or indirectly.

The vice of such searches has been exposed often. *United States* v. *Lefkowitz*, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775], involved a charge of conspiracy to violate the National Prohibition Act. Government agents made a search of office desk drawers, towel cabinets, waste baskets and other containers and delivered all seized papers to the prosecutors. Upon a motion to suppress that evidence the government contended "that, since the arrests were lawful, the search of the place where they were made was lawful, and that, having the right to search the premises, the officers were bound to do it thoroughly." (P. 462.) The court said, in holding that the motion should have been granted: "The only question presented is whether the searches of the desks, cabinets and baskets and the seizures of the things taken from them were reasonable as an incident of the arrests. And that must be decided on the basis of valid arrests under the warrant. Save as given by that warrant and as lawfully inci-

dent to its execution, the officers had no authority over respondents or anything in the room. The disclosed circumstances clearly show that the prohibition agents assumed the right contemporaneously with the arrest to search out and scrutinize everything in the room in order to ascertain whether the books, papers or other things contained or constituted evidence of respondents' guilt of crime, whether that specified in the warrant or some other offense against the Act. Their conduct was unrestrained. . . . [Pp. 463-464.]

''Here, the searches were exploratory and general and made solely to find evidence of respondents' guilt of the alleged conspiracy or some other crime. Though intended to be used to solicit orders for liquor in violation of the Act, the papers and other articles found and taken were in themselves unoffending. The decisions of this court distinguish searches of one's house, office, papers or effects merely to get evidence to convict him of crime from searches such as those made to find stolen goods for return to the owner, to take property that has been forfeited to the Government, to discover property concealed to avoid payment of duties for which it is liable, and from searches such as those made for the seizure of counterfeit coins, burglar's tools, gambling paraphernalia and illicit liquor in order to prevent the commission of crime. . . . [Pp. 465-466.]

''An arrest may not be used as a pretext to search for evidence. The searches and seizures here challenged must be held violative of respondents' rights under the 4th and 5th Amendment.'' (P. 467.) To the same effect are: *Go-Bart Co.* v. *United States,* 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *Harris* v. *United States, supra,* 331 U.S. 145; *Nardone* v. *United States, supra,* 308 U.S. 338; *United States* v. *1013 Crates of Empty etc. Whiskey Bottles,* (2 C.C.A.) 52 F.2d 49, 51; *Drayton* v. *United States,* (5 Cir.) 205 F.2d 35; *Lott* v. *United States,* (5 Cir.) 218 F.2d 675, 678.

Though some of the authorities would limit the search to instrumentalities of the crime (*Freeman* v. *United States,* (C.C.A. 9th Cir.) 160 F.2d 72; *Henderson* v. *United States,* (4 Cir.) 12 F.2d 528 [51 A.L.R. 420]; *Worthington* v. *United States,* 166 F.2d 557, 566; *Takahashi* v. *United States,* 143 F.2d 118, 123), the right is not so narrowly confined in this jurisdiction. It may be exercised in aid of discovery of evidence of the particular crime for which the arrest is made. In *People* v. *Allen,* 142 Cal.App.2d 267, 280 [298 P.2d 714], this court, referring to *United States* v. *Rabinowitz,* 339 U.S.

56 [70 S.Ct. 430, 94 L.Ed. 653], said: "While the court condemned 'general, exploratory searches,' it did not suggest as violative of the constitution a reasonable search for specific evidence at the locale of the crime." (See also *People* v. *Coleman*, 134 Cal.App.2d 594, 599 [286 P.2d 582]; *People* v. *Ortiz*, 147 Cal.App.2d 248, 251-252 [305 P.2d 145]; *People* v. *Morgan*, 146 Cal.App.2d 722, 723-724 [304 P.2d 138]; *People* v. *Smith*, 142 Cal.App.2d 287, 293 [298 P.2d 540].)

Where the bounds of a reasonable search have been exceeded, as here, neither the evidence wrongfully seized nor any of its derivatives may be used against defendant. *Silverthorne Lbr. Co.* v. *United States*, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426], is the leading case on this point. After unlawful seizure of certain documents, which were ordered to be returned to the defendant, the prosecutors made photostats and other copies of same, brought a new indictment and subpoenaed the originals of the papers previously returned to the defendant. In holding that there was no contempt in refusal to obey those subpoenas the court, through Mr. Justice Holmes, said at page 391: "The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession, but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act. . . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed."

The same holding was made in *People* v. *Berger*, 44 Cal.2d 459 [282 P.2d 509], where an attempt was made to use photostats of documents which had been wrongfully seized, the court saying, at page 462: "Since the photostats are as much a product of the illegal search and seizure and are as tainted by it as the original papers themselves (*Silverthorne Lbr. Co.* v. *United States*, 251 U.S. 385, 392 [40 S.Ct. 182, 64 L.Ed.

319, 24 A.L.R. 1426]), the deception practiced by the prosecution in this case cannot circumvent the rule adopted in *People* v. *Cahan, ante,* p. 434 [44 Cal.2d] [282 P.2d 905]." The rule is well stated in *Walder* v. *United States,* 347 U.S. 62, 64 [74 S.Ct. 354, 98 L.Ed. 503] : "The Government cannot violate the Fourth Amendment . . . and use the fruits of such unlawful conduct to secure a conviction. *Weeks* v. *United States* (US) *supra.* Nor can the Government make indirect use of such evidence for its case, *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 [64 L.Ed. 319, 40 S.Ct. 182, 24 A.L.R. 1426], or support a conviction on evidence obtained through leads from the unlawfully obtained evidence, *cf.* *Nardone* v. *United States,* 308 U.S. 338, 84 L.Ed. 307, 60 S.Ct. 266]. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." This language was quoted in *People* v. *Martin,* 45 Cal.2d 755, 760 [290 P.2d 855].

The Silverthorne doctrine was recognized and applied in *Badillo* v. *Superior Court, supra,* 46 Cal.2d 269, 273, and *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]. In the latter case it was held that defendant's own testimony "was impelled by the erroneous admission of the illegally obtained evidence and cannot be segregated from that evidence to sustain the judgment."

*People* v. *Martin,* 382 Ill. 192 [46 N.E.2d 997], is factually foursquare with the case at bar, and it was held that the witnesses discovered through the wrongfully seized documents could not testify to the other crimes disclosed by those documents. At page 1002 [46 N.E.2d] it is said: "To permit the illegal action of the officers of the law in this case to redound to its advantage would impair the constitutional safeguards under consideration. Under the circumstances presented here it requires more than a mere assertion by the State's Attorney that the evidence used against defendants was obtained from an independent source. On the face of it it could not be an independent source. No showing is made of any kind that the name of any one of the witnesses was obtained in any other manner than by an examination of the papers of the plaintiffs in error. . . .

"It is only necessary for us to determine whether it has been shown the testimony of the witnesses was received from independent sources, and upon that question we find there is nothing in the record to substantiate the claims of the prosecu-

tion, but upon the other hand it is almost conclusive that the information to be given by all of the material witnesses in the case was obtained from the matters illegally seized, and this being our conclusion, the evidence should have been suppressed and excluded. If it be urged the prosecution of plaintiffs in error is thus made difficult, the fault does not grow out of the provisions of the constitution, but from a disregard of such provisions by the officers sworn to support and enforce them." *Simmons* v. *State*, ——Okla.Crim. —— [277 P.2d 196], makes the same holding, as do other cases cited in an annotation appearing in 50 American Law Reports 2d at 569.

At all stages of the case Mills objected to the use of the seized documents and sought to exclude evidence based thereon or derived therefrom. This is true of all counts except 14, which deals with the Hull transaction and which was expressly excluded from the motion to strike made after the close of the prosecution's case. ██ The evidence of count 14 being sufficient, as we shall see, to sustain the conviction without the direct or indirect aid of wrongfully seized matters, that conviction may stand regardless of the disposition of the other counts. (See *People* v. *Tarantino*, 45 Cal.2d 590, 596-597 [290 P.2d 505].)

Mills asserts the evidence to be insufficient to sustain a conviction upon the charge of count 14. In support of this position he asserts that the evidence shows only a loan transaction or a sale made by him of individually owned stock, and that it falls within the exemption of section 25152, Corporations Code, which reads: "Except as expressly provided in this division, the Corporate Securities Law does not apply to the sale of securities when (a) made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of the securities, disposes of his own property for his own account, and (b) the sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of the Corporate Securities Law." Defendant's own testimony would have sustained a finding in his favor on this issue, but it was disbelieved by the trial judge; moreover, he was impeached by the former conviction of a felony, issuing checks without sufficient funds.

██ The rule governing a court of review with respect to sufficiency of the evidence is stated in *People* v. *Newland*,

15 Cal.2d 678, 681 [104 P.2d 778]: "The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury."

That this was not a sale made by an owner for his own account appears from the memorandum dictated by defendant and delivered to Lieutenant Hull (quoted in footnote 1, *supra*). It evidences sale to Hull of 10 per cent "of the smelter checks as received from the Blossom Mine," until payments shall have totaled $6,000 within one year; Hull is to "be notified when each shipment is made," and according to his testimony, "my check would come directly from the ore being shipped to the smelter, and would be sent to me from the smelter, American Smelting and Refining, as I recall, in Salt Lake City." After receiving the agreed $6,000 within the specified time, "your [Hull's] percentage in the production from the mine ceases but in lieu thereof you will own outright without further consideration 30,000 shares of Searchlight Uranium Corporation." This transaction involved two corporate securities, first, an undivided interest in the gross income of the corporation and its mine (Corp. Code, § 25008; *People* v. *Sidwell*, 27 Cal.2d 121, 129 [162 P.2d 913]), and second, shares of stock in that corporation.

■ Clearly, the sale of an interest in the proceeds of the mine does not fall within the exemption of section 25152, unless perchance Mills was, as he represented, the sole owner

of the mine and the corporation. But in that event he would become the issuer and thus be excluded from the exemption. Mills' evidence as to the transaction having been rejected by the trial judge, that which was accepted established him to be the issuer of the stock which he sold. He represented to Hull that he owned all the stock of the corporation, was sole owner of the mine, and that Hull would be the first outside holder of stock. Those statements, adverse to his own present interests, constitute independent and affirmative evidence of the fact. ■ "It is true in a criminal case as in civil actions that a statement against interest made by a party constitutes original and independent evidence of the facts so stated." (*People* v. *Goldstein*, 136 Cal.App.2d 778, 785 [289 P.2d 581].) ■ A sale of stock or other undivided interest in a corporation which is the seller's alter ego spells a sale by the issuer in legal contemplation. So held in *People* v. *Murphy*, 17 Cal.App.2d 575, 582-584 [62 P.2d 592].; *People* v. *Smith*, 111 Cal.App. 177, 186 [295 P. 105]; *People* v. *Allen*, 47 Cal.App.2d 735, 745 [118 P.2d 927]. Especially is this true where the seller's own shares are transferred to the corporation and it in turn issues a certificate to the buyer. That is what was done in this case, assuming the truth of defendant's testimony. (*Castle* v. *Acme Ice Cream Co.*, 101 Cal.App. 94, 99 [281 P. 396].)

Referring to the exemption provision of the former statute (in language almost identical with present section 25152), the court said, in *People* v. *Mason*, 86 Cal.App.2d 445, 454 [195 P.2d 60]: "This language is tantamount to declaring it to be a felony if by the sale of a security prior to the issuance of a permit to the issuer by the Corporation Commissioner the vendor causes the issuer thereof to profit or to be advanced by such sale." That Mills was selling for the benefit of the corporation is fairly inferable. If it, not Mills, was the issuer, then the statutory exemption would not apply. The representations made to Hull by defendant as an inducement for the purchase by him support an implied finding that the sale was being made for the benefit of the corporation. Indeed, that is the only fair deduction to be made from the terms of the memorandum, Exhibit 4. Otherwise, Hull would not be receiving 10 per cent of the smelter checks directly from United States Smelting Refining and Mining Company, of Salt Lake City, as his "percentage in the production from the mine." In fact, appellant's opening brief says, at page 2, that Hull "as such potential investor was to advance $3,000.00 to aid in carrying on such mining operations."

Mills does not claim entrapment, but does argue that Hull committed a fraud upon him and, as Hull never intended to consummate a purchase, the transaction was vitiated and there was no sale. Reliance is placed on *People* v. *Schroeder*, 132 Cal.App.2d 1 [281 P.2d 297], and *People* v. *Werner*, 16 Cal.2d 216 [105 P.2d 927], but those cases are not in point. Each dealt with a charge of grand theft or attempted grand theft and held that there could be no such crime when the alleged victim voluntarily transferred the property to the defendant. That is not the question here. ▆ Insofar as Mills was concerned he had delivered the stock with intent to transfer title to the shares. Moreover, an offer or an attempt to make a sale comes within the statutory definition of sale. (Corp. Code, § 25009; *People* v. *Sidwell, supra,* 27 Cal. 2d 121, 127; *People* v. *Whelpton,* 99 Cal.App.2d 828, 831-832 [222 P.2d 935].) There is no merit in the claim that the statute was not violated by a sale to Hull.

It follows that the judgment against Mills and the order denying his motion for a new trial must be affirmed as to count 14.

Defendant Cavanaugh, who is a layman, appeared in propria persona. At the beginning of the trial defendant Mills stated the following stipulation to which Cavanaugh and Kroger agreed: "The three defendants want to agree to a stipulation amongst themselves that any questions which I may ask any witness, or any statement I make, or any motion in the case, will be agreeable to them unless they object to it at the time. I will bear the brunt of the work in this case because of my experience, and any testimony introduced on behalf of either of us may be considered the testimony in favor of each of us, wherever material." To this Cavanaugh added: "I have decided to let Mr. Mills handle it." This course was pursued throughout the hearing, Mills speaking for Cavanaugh and the latter following his lead.

The evidence against Cavanaugh consisted of documents seized in the search of Mills' rooms and testimony flowing from them and built upon them; aside from that type of evidence there was not enough to hold Cavanaugh on any count. His own testimony related to transactions disclosed by the seized documents.

▆ The violation of Mills' constitutional rights was available to Cavanaugh, as has been held in *People* v. *Martin, supra,* 45 Cal.2d 755, 761; *People* v. *Kitchens,* 46 Cal.2d 260, 264 [294 P.2d 17]; *People* v. *Gale,* 46 Cal.2d 253, 257 [294 P.2d 13]; *People* v. *Silva,* 140 Cal.App.2d 791, 794 [295 P.2d

942]. Moreover, as held in *People* v. *Dixon, supra,* 46 Cal.2d 456, 458, testimony thus forced from a defendant by the use of unlawfully seized evidence and its progeny cannot be used against him. Cavanaugh makes this point in his "statement" attached to Mills' opening brief. His right to avail himself of a wrongful search and seizure of Mills' property is not dependent upon whether he himself made an appropriate objection in the trial court. While we think the record shows that he did so, the question of whether he did cannot control the judgment. In *McDonald* v. *United States,* 335 U.S. 451 [69 S.Ct. 191, 93 L.Ed. 153], it appeared that defendant McDonald had moved for return of certain property which had been wrongfully seized from him. The lower court denied the motion and this was held to have been erroneous. At page 456 the court said: "It [the motion] was, however, denied and the unlawfully seized evidence was used not only against McDonald but against Washington as well, the two being tried jointly. Apart from this evidence there seems to have been little or none against Washington. Even though we assume, without deciding, that Washington, who was a guest of McDonald, had no right of privacy that was broken when the officers searched McDonald's room without a warrant, we think that the denial of McDonald's motion was error that was prejudicial to Washington as well. . . . If the property had been returned to McDonald, it would not have been available for use at the trial. We can only speculate as to whether other evidence which might have been used against Washington would have been equally probative." Mr. Justice Jackson, in a concurring opinion, said this on the same subject, at page 461: "As to defendant Washington: He was a guest on the premises. He could have no immunity from spying and listening by those rightfully in the house. But even a guest may expect the shelter of the rooftree he is under against criminal intrusion. I should reverse as to both defendants." The McDonald case was discussed with apparent approval in *People* v. *Martin, supra,* 45 Cal.2d 755, 760-761, our Supreme Court saying: "In *McDonald* v. *United States,* 335 U.S. 451, 456 [69 S.Ct. 191, 93 L.Ed. 153], it gave effect to this policy by reversing the conviction of both defendants although only the rights of one had been violated. It pointed out that had the evidence been returned to the defendant from whom it was illegally taken, it would not have been available for use against the other defendant, and held therefore that its admission was prejudicial as to both. [Cita-

tions.] It is true that in the McDonald case a pretrial motion for the return of the evidence by the defendant whose rights were violated had been erroneously denied. There is no basis for concluding, however, that a defendant whose rights have not been violated should have standing to challenge a pretrial ruling against his codefendant, if he has no standing to challenge the legality of the original seizure. In either situation his right to object to the use of the evidence must rest, not on a violation of his own constitutional rights, but on the ground that the government must not be allowed to profit by its own wrong and thus encouraged in the lawless enforcement of the law.

"Since all of the reasons that compelled us to adopt the exclusionary rule are applicable whenever evidence is obtained in violation of constitutional guarantees, such evidence is inadmissible whether or not it was obtained in violation of the particular defendant's constitutional rights." See also *Anderson* v. *United States*, 318 U.S. 350, 356 [63 S.Ct. 599, 87 L.Ed. 829], and *United States* v. *Haupt*, 136 F.2d 661, 672, which have to do with the prejudicial effect of confessions which are inadmissible as to certain defendants and have been received against them and others charged with them who did not confess. As it is necessary to reverse as to Mills upon all counts which include Cavanaugh, it would be a miscarriage of justice to require the latter to pay the penalty from which his codefendant has been exonerated, at least temporarily.

An appeal from an order denying a motion in arrest of judgment will not lie (*People* v. *Tidwell,* 108 Cal.App.2d 60, 62 [238 P.2d 21] ; 3 Cal.Jur.2d, § 91, p. 542), and those attempted appeals are dismissed.

The judgment and the order denying new trial are reversed as to defendant Cavanaugh in their entirety. The judgment and order denying new trial are reversed as to defendant Mills upon counts 1 to 12 of the information,[6] but affirmed as to the charge of count 14.

Moore, P. J., and Fox, J., concurred.

Petitions for a rehearing were denied February 25, 1957, and the petitions of respondent and of appellant Homer C. Mills for a hearing by the Supreme Court were denied April 2, 1957. Gibson, C. J., Shenk, J., and Spence, J., were of the opinion that the petitions should be granted.

---

[6] Count 13 was dismissed.