**STATE of Tennessee, Appellee,**

v.

**Randy LAYNE, Bass Layne, and Pearlie Layne, Appellants.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 18, 1981.

Permission to Appeal Denied by Supreme Court Oct. 13, 1981.

Howard G. Swafford, Raulston, Swafford & Swafford, (at trial only), Jasper, William H. Ortwein, Ortwein & Associates, Chattanooga, for Randy Layne.

William C. Killian, Chattanooga, for Bass Layne.

Ben L. Hill, III, Jasper, for Pearlie Layne.

William M. Leech, Jr., Atty. Gen., John C. Zimmermann, Asst. Atty. Gen., Nashville, J. William Pope, Dist. Atty. Gen., Pikeville, Mike Caputo, Asst. Dist. Atty. Gen., Jasper, for the State.

## OPINION

SCOTT, Judge.

The appellants, an elderly couple and their grown son, were jointly indicted for manufacturing marijuana and possession of marijuana with intent to deliver or sell, both charges being violations of TCA, § 52–1432(a)(1)(F). All three were convicted and received sentences of not less than two nor more than five years in the state penitentiary, and a fine of $500.00 for each count. The sentences were ordered to be served concurrently and probation was denied. Randy Layne's sentences were ordered to be served consecutively to a sentence he received in Hamilton County. In identical briefs the appellants have presented three issues for our consideration.

Although there is no issue concerning the sufficiency of the evidence, a recital of the facts is necessary for an understanding of the issues.

On October 2, 1979, law enforcement officers from the Tennessee Bureau of Criminal Identification, the Alcoholic Beverage Commission, the Tennessee Highway Patrol, and the Franklin County Sheriff's Department were flying over Grundy County in a marked Tennessee Highway Patrol helicopter. They were searching for stripped cars, moonshine stills, patches of marijuana, and law violations generally.

The men had completed their work and were returning to their base of operations when James Parrott, a T.B.I. agent, suggested that they should fly over the Layne farm. He had a tip that marijuana might be found there and he had previously tried, unsuccessfully, to find some there. As they crossed over the edge of Ross Mountain, at an altitude of 1,800 feet, and before reaching the appellants' property, the helicopter pilot, Mike Dover, spotted a field of marijuana. Four or five people were seen in the field.

As the helicopter approached, the people first attempted to hide under the tall plants by lying on the ground hiding their faces.

As Mr. Dover maneuvered the helicopter to land and it became obvious to the people on the ground what he was doing, they fled in various directions. Two appellants were caught and one later surrendered.

While the men ran toward the woods, Pearlie Layne ran to the house located on the property. The officer who caught her observed that her bare feet were stained bright green. On the way to the house the officer passed the barn and observed that it was chock-full of harvested marijuana, which was stored therein in much the same manner as tobacco is cured.

Mr. Dover testified about his expertise at detecting marijuana from aerial observation and his expertise was never seriously challenged. Mr. Dover explained that in the fall all other plants become a dull brown dried color. Marijuana maintains its deep velvet green color until it is harvested and dried. It is because of this characteristic that, in the autumn, Mr. Dover is able to accurately identify this plant from a great distance.

This marijuana was described by Mr. Dover as the biggest plants that he had ever seen, being 15 to 20 feet tall. It was necessary to bring in other officers with chain saws to cut them down. The men worked from 1:00 P.M. on the day of the appellants' arrest until dark, and the next day from daylight until dark, cutting and destroying by fire the large quantity of marijuana these appellants had standing in the field and stored in the barn. The total crop amounted to 7 or 8 tons of marijuana.

First, the appellants question whether the trial court erred by refusing to grant their motions to suppress the marijuana which was seized as the result of an allegedly illegal search and seizure.

In its brief the state contends that Randy Layne lacks "standing" to challenge the legality of the search and seizure. "Standing" was not litigated or mentioned in the trial court by either side. During the evidentiary hearing on the motion to suppress, none of the appellants testified and no proof of ownership was presented.

In *Steagald v. United States*, —— U.S. ——, 101 S.Ct. 1642, 1645–1646, 68 L.Ed.2d 38 (1981), the prosecution sought a remand to allow the re-examination of the question whether the petitioner had a reasonable expectation of privacy in a house to prevail on his Fourth Amendment claim. This argument was never raised in the trial court or intermediate appellate court, but was first asserted in our highest tribunal. In its brief in opposition to certiorari the Government had represented the house as "petitioner's residence" and that it was "occupied by petitioner" and others.

The Court noted that Government was entitled to initially defend the challenge to the legality of the search by asserting that the petitioner had no reasonable expectation of privacy, that he consented to the search, or that exigent circumstances justified the entry. The Court noted that:

> The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.

During his case in chief, Randy Layne testified that his parents, Bass and Pearlie Layne, made their home on the farm, but that the land belonged to others. He and his father testified that only Randy farmed there, but without payment of any rent. In addition to marijuana, he raised hogs and grew corn for his hogs. In addition to the proof concerning his work on the day of the raid, there was some contradiction of the limited extent of Bass Layne's participation in the farming operation.

█ The trial court is the proper forum to litigate disputed factual issues. Oral testimony can be presented from live witnesses, whose manner and demeanor the trial judge can assess. Documentary evidence can be gathered and laid before the trial judge for his evaluation.

In *State v. Shelby Shrum and Johnny Tittle*, Court of Criminal Appeals, filed at Nashville, March 3, 1981, Judge Walker in-

ferentially held that "standing" could not be raised by the state on appeal, not having been "raised in the trial court."

■ In view of the state's failure to timely raise this issue in the trial court, we hold that the state has lost its right to litigate this factual question in this Court. We will consider the Fourth Amendment issue as to all three appellants.

We have no Tennessee case directly dealing with the legality of helicopter searches. The appellants rely heavily upon *State v. Dana Lilly*, Court of Criminal Appeals, filed at Jackson, June 15, 1980, where this Court noted that a helicopter search at an altitude of three hundred yards over the appellant's property, after the officers had received information from an informant, but before a warrant was issued, was an illegal intrusion onto the property, since there were no exigent circumstances. However, the statement from *Lilly* was dictum.

There are a number of cases from other jurisdictions wherein the legality of helicopter searches have been considered.

In *United States v. DeBacker*, 493 F.Supp. 1078, 1081 (W.D.Mich.1980), a marijuana crop was discovered by the police, who, acting upon an anonymous tip, flew over the defendant's property located in the Michigan boondocks at an altitude of two hundred feet and later at fifty feet.

The Court analyzed the Fourth Amendment question not by declaring entire areas as outside the protection of the Amendment, (such as "open fields") but by assessing the nature of the particular practice and the likely extent of its impact on the individual's sense of security, balanced against the utility of the conduct as a technique of law enforcement. The issue is whether "if the particular form of surveillance practiced by police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." Citing Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349, 403 (1974).

The Court held that the defendant's Fourth Amendment rights were not violated, noting that the police were in a place they otherwise had a right to be and that the fields were plainly observable from the air. Merely because the contraband was neatly planted in places not observable from the road did not foreclose all surveillance of the property.

In *People v. Lashmett*, 71 Ill.App.3d 429, 27 Ill.Dec. 657, 389 N.E.2d 888 (1979), stolen tractors were initially observed on the defendant's farm by means of aerial surveillance. Later, the Sheriff walked onto the farm, inspected the identification numbers, and then went for a search warrant. The Illinois Court, relying upon the "open fields" doctrine, upheld the search, emphasizing the fact that the initial aerial observations were from two thousand four hundred feet, and that the area searched was far away from the dwelling and its curtilage.

In *State v. Lakin*, 588 S.W.2d 544, 547 (Tenn.1979), our Supreme Court cited *Lashmett*. However, our highest court pointed out that the phrase "open fields" has never been used by it, and that its search and seizure decisions have been somewhat more restrictive than comparable federal cases.

The nation's top agricultural state has been the scene of innumerable marijuana harvests. Therefore, a number of cases concerning helicopter searches have originated in the courts of California. In *People v. Sneed*, 32 Cal.App.3d 535, 543, 108 Cal. Rptr. 146, 149 (1973), the defendant grew marijuana plants in a corral near his home. The plants could not be seen from any public vantage point on the ground. However, law enforcement officers flew a helicopter over his property twenty to twenty-five feet above the terrain. The Court phrased the basic test as to whether there has been an unconstitutional invasion of privacy as "whether the person has exhibited a subjective expectation of privacy which is objectively reasonable and, if so, whether that expectation has been violated by unreasonable governmental intrusion." The test of reasonableness is dependent

upon the totality of the facts and circumstances in each case. The California court remarked that the appellant in that case "certainly had no reasonable expectation of privacy . . . from airplanes and helicopters flying at legal and reasonable heights." Apparently swayed by the extremely low level of the overflight, the Court of Appeals held the search unconstitutional.

In *Dean v. Superior Court*, 35 Cal.App.3d 112, 117, 110 Cal.Rptr. 585 (1973), the California court found that police overflights which revealed four hundred marijuana plants was constitutional. The Court noted that agriculturists do not conceal their wheat or oat fields from aerial view. Marijuana fields deserve no greater protection.

In *People v. Superior Court*, 37 Cal. App.3d 836, 112 Cal.Rptr. 764 (1974), a stolen car was hidden behind a five foot fence. The car was spotted by a police helicopter flying five hundred feet overhead. Since the fence did not keep the public from seeing the car from the ground, the defendant had exhibited no reasonable expectation of privacy and the search was constitutional.

In *Burkholder v. Superior Court*, 96 Cal. App.3d 421, 158 Cal.Rptr. 86, 88–89 (1979), the Court upheld an aerial search which revealed a marijuana patch. Flying at one thousand five hundred to two thousand feet the officers used high powered binoculars to make their observation. The Court observed that "a possessor of land devoted to the cultivation of contraband can exhibit no reasonable expectation of privacy from an overflight consistent with the common habits of persons engaged in agrarian pursuits. When such contraband is plainly visible from a vantage point where officers had a right to be, there can be no reasonable expectation of privacy and no search in the constitutional sense."

In *People v. St. Amour*, 104 Cal.App.3d 886, 163 Cal.Rptr. 187, 191 (1980), a marijuana garden was first discovered via an aerial search employing only the naked eye. Incredibly, this observation was from an altitude of four thousand to five thousand feet. Descending to one thousand to one thousand five hundred feet, high powered binoculars were then employed to verify the discovery. The Court noted that "in order to be constitutionally protected from overflights the person must show that the land in question is expected to be private according to the common habits of persons engaged in agriculture." The Court noted that the officers were flying at normal heights and they observed the marijuana plantation from a place they had a right to be. See generally: Granberg, "Is Warrantless Aerial Surveillance Constitutional?", 55 Calif. State Bar J. 451, wherein the author criticizes all of the California cases on this subject.

*State v. Stachler*, 58 Haw. 412, 570 P.2d 1323, 1327–1328 (1977), is a case strikingly similar to this one. The law enforcement officers were flying their helicopter around the Island of Hawaii, at an altitude of three hundred feet. They spotted an area 9 × 12 feet where marijuana plants were growing. The patch was about fifteen feet from the defendant's home.

■ Chief Justice Richardson of the Hawaii Supreme Court began his analysis where all such analyses should begin—by looking to the question whether the helicopter observation constituted a "search" subject to Fourth Amendment protection. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), cited in *Stachler*, established the principle that official intrusions into matters or activities as to which an individual has exhibited a "reasonable expectation of privacy" are searches within the meaning of the Fourth Amendment. A "reasonable" expectation of privacy is something more than a subjective expectation. It must be an expectation that "society is prepared to recognize as reasonable." Harlan, J., concurring in *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516, cited at 570 P.2d at 1326.

■ No reasonable expectation of privacy can be asserted when the object is in "open view" for any person to observe. 570 P.2d at 1326–1327. Thus, the Hawaii Supreme Court held that the surveillance was

not a "search" within the meaning of the Fourth Amendment. The Court found that this marijuana patch was in "open view." At the time they observed the marijuana, the law enforcement officers had a right to be where they were. There was, therefore, no reasonable expectation of privacy.

■ The Court distinguished "open view" from "plain view". "Plain view" refers to observations which take place *after* an intrusion into activities or areas as to which there is a reasonable expectation of privacy. If the original intrusion is justified, such as by consent, hot pursuit, warrant, or incidental to an arrest, objects observed in "plain view" are admissible so long as the view was inadvertent. Citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971). However, in the "open view" situation, no search is involved and the requirement that the view be inadvertent is not applicable. 570 P.2d at 1327.

The Hawaii court noted several factors which bear upon the reasonable expectation of privacy, viz: the height of the helicopter; whether there had been continual aerial harassment or prolonged aerial surveillance; whether highly sophisticated viewing devices were employed; and the frequency of helicopter and general aviation aircraft flights in the area. The Court noted that one who established a tract under cultivation exhibits no reasonable expectation of immunity from overflight.

■ We adopt the reasoning of the Hawaii Supreme Court. We hold that when law enforcement officers are in a place where they have a right to be and as a result thereof observe criminal activity, clearly recognizable as such, on the property of a defendant, the "open view" exception arises. The observation by the officers does not constitute a "search" as contemplated by the Fourth Amendment of the United States Constitution and Article I, § 7, of the Tennessee Constitution. There is also no requirement that the view be inadvertent.

By the Air Commerce Act of 1926, Congress declared that the public generally has a right of freedom of transit through the "navigable air space of the United States." 49 U.S.C., § 1304. The "navigable air space of the United States" is defined as air space above the minimum altitudes of flight prescribed by regulations issued pursuant to the statute. 49 U.S.C., § 1301. Under the regulations promulgated by the Federal Aviation Administration aircraft shall maintain an altitude of five hundred feet above the surface over other than congested areas, water, and sparsely populated areas. In sparsely populated areas aircraft may not be operated closer than five hundred feet to any person or structure. 14 CFR, § 91.79(c). Helicopters may be operated at less than the five hundred feet minimum if the operation is conducted without hazard to persons or property on the surface. 14 CFR, § 91.79(d).

By this legislation and the regulations promulgated thereunder, Congress rejected the ancient *ad coelum* doctrine expressed by the maxim, "Cujus est solum, ejus est usque ad coelum et ad inferos." (The owner of a piece of land owns everything above or below it to an indefinite extent.) 2A C.J.S. Aeronautics and Aerospace, § 8.

Our Supreme Court recognized the doctrine in *Granberry v. Jones*, 188 Tenn. 51, 216 S.W.2d 721, 722 (1949), with the statement that "(e)very owner of land has dominion of the soil, and above and below to any extent he may choose to occupy it with some exceptions not pertinent here." The "exception" covered by Congress was one of those "not pertinent" to that case which involved a tall hedge on the boundary line between the litigants' properties.

In fact, it has been questioned whether the *ad coelum* doctrine ever was an authentic statement of law. The maxim arose largely from dicta, since the early cases were limited to facts and conditions close to earth and did not require an adjudication of the title to the "mansions in the sky." *Thrasher v. City of Atlanta*, 178 Ga. 514, 173 S.E. 817, 825 (1934).

An early expression of the doctrine by the Tennessee Supreme Court is found in dictum in *Humes v. Mayor of Knoxville*, 20 Tenn. (1 Humph.) 403, 407 (1839), long before the Wright Brothers' historic flight at Kitty Hawk on December 17, 1903.

■ In this case the officers were present in a helicopter at one thousand eight hundred feet above the terrain, within the navigable air space of the United States, a place they had a perfect legal right to be. The fact they were where they were as the result of a tip or hunch is of no legal significance. From their vantage point they observed unharvested marijuana in the field, and as they approached, they saw these appellants tending their crop. Observing a felony being committed in their presence, they clearly were justified in descending to the ground to arrest these appellants. TCA, § 40–803(1), *McCanless v. Evans*, 177 Tenn. 86, 146 S.W.2d 354, 356 (1941).

This case is analogous to an officer on routine preventive patrol on a public street. Whether inadvertently or as the result of a tip, the officer drives past a certain residence. From the public thoroughfare he observes a husband assaulting his wife in the front yard. There can be no doubt that in that case the officer is clearly justified in leaving the public way to go upon the premises to effect the arrest of the individual committing an offense in his presence. This issue has no merit.

Next, the appellants contend that there was a conflict of interest which should have precluded their trial defense counsel from representing all three appellants.

As the state correctly points out, the appellants did not raise this issue at trial. No complaint was ever registered with the trial judge until motions for a new trial were filed by each appellant.

■ Since the record contains no appointment of counsel, we conclude that these appellants were not indigent and that each chose to retain the same attorney. They have all retained separate appellate counsel, but their briefs are identical.

In their briefs the appellants cite five instances of alleged conflicts which they conclude denied them the effective assistance of counsel. These instances consisted of the fact that Randy Layne testified that the marijuana was his and that his parents had no guilt. Bass Layne also testified that the marijuana did not belong to him or his wife, but that it belonged to their son, Randy. Oscar Brown, the Manager of the Grundy County Farmers Cooperative, testified that Randy Layne bought food for his hogs and other farm supplies from his business. Bass Layne sometimes hauled the purchases to the farm. Since this proof tended to implicate Randy and to exonerate his parents, Randy now contends that his counsel was prosecuting his own client by putting his proof in the record.

Another instance of alleged misconduct involved the failure of counsel to object to the following testimony by an officer: "And Mrs. Layne asked me, said she would just like to know who turned *us* in." (emphasis added)

Counsel contends that this was an obvious violation of the rule announced in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since Pearlie Layne did not testify.

Pearlie Layne and Bass Layne also complain that they were not allowed to cross-examine Randy Layne. Randy Layne and Pearlie Layne complain because they were not allowed to cross-examine Bass Layne.

The appellants rely on *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), for the rule that a conflict of interest between multiple defendants represented by the same attorney requires a reversal regardless of any showing of prejudice. However, in *Holloway*, the trial defense counsel had specifically requested the appointment of separate counsel and the request was denied by the trial judge.

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980), the United States Supreme Court held that:

*Holloway* requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in *Holloway,* supra, at 485–486, 98 S.Ct., at 1179, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" 435 U.S., at 485, 98 S.Ct., at 1179, quoting *State v. Davis,* 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

In this case there was no timely objection to multiple representation, and we find no special circumstances. The trial court and this Court must assume that the multiple representation entailed no conflict or that the attorney and his clients knowingly accepted such risk of conflict as may have existed.

■ Randy Layne obviously sought to take the heat and attempted to exonerate his parents. His own testimony clearly reveals that this was his intent. Certainly he cannot now complain about his own testimony or the testimony of his father and the cooperative manager who were called to corroborate his theory.

■ There was no *Bruton* violation. While Mrs. Layne referred to the fact that someone turned "us" in to the law enforcement officers, this statement was the only isolated statement about the other appellants attributed to her. Since all of the appellants were caught red-handed in the field, her statement was one which would naturally be made under those circumstances.

As to the denial of cross-examination, the appellants knew when they retained the same attorney that they would be unable to cross-examine each other. These appellants were not three antagonistic criminals involved in a one-time joint enterprise. This was a family marijuana farming operation. The defense theory at trial was that Randy was guilty and that the others were not involved in any way.

If indeed it was error for counsel to represent the entire family, we cannot say that this error involved a substantial right which more probably than not affected the judgment or which resulted to prejudice in the judicial process. Rule 36(b), T.R.A.P.

Finally, the appellants contend that the court erred in overruling the motion to quash the indictment, or in the alternative to strike one of the counts. We agree.

In this case the appellants were charged with and convicted of "manufacturing" marijuana and "possession" of marijuana. The state in its brief contends that this was proper, since there was marijuana in the field that they were "manufacturing" and there was other marijuana in the barn which they "possessed" for the purpose of sale. The indictment makes no distinction about which marijuana was charged in each count. They were simply charged with "possession" of marijuana and with "manufacturing" marijuana. The marijuana in the barn was, by the state's own proof, in a late stage of the manufacturing process, since it was being cured. Other marijuana was being cured on a plastic sheet lying in the sunshine.

■ The infallible test to determine whether a given offense is lesser than and included in the one charged is that the lesser included offense must be such that it

is impossible to commit the greater offense without first having committed the lesser. *Wright v. State*, 549 S.W.2d 682, 685 (Tenn. 1977). The crime of manufacturing marijuana necessarily involves the possession of the substance being manufactured. It is hardly possible for one to be charged with "manufacturing" without having the marijuana in possession.

The possession with the intent to sell count was necessarily included in the manufacturing count. Therefore, dual convictions were improper. The conviction for felonious possession of marijuana with intent to sell is reversed and dismissed as to each appellant. The conviction for manufacturing marijuana is affirmed as to each appellant.

DWYER and DAUGHTREY, JJ., concur.