IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 25, 2001 Session

## STATE OF TENNESSEE v. MORRIS JASON PEPPER

**Appeal as of Right from the Circuit Court for Lincoln County**
**No. S9900118     Charles Lee, Judge**

_____

**No. M2000-00883-CCA-R3-CD - Filed September 19, 2001**

_____

The appellant, Morris Jason Pepper, was convicted by a jury in the Lincoln County Circuit Court of one count of first degree premeditated murder and was sentenced to life imprisonment. On appeal, the appellant raises the following issues for our review: (1) whether the evidence is sufficient to sustain his conviction; and (2) whether the trial court erred by failing to grant the appellant's motion to suppress. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

John B. Nisbet, III, Cookeville, Tennessee; Donna Orr Hargrove and Andrew Jackson Dearing, III, Fayetteville, Tennessee, for the appellant, Morris Jason Pepper.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; W. Michael McCown, District Attorney General; Weakley E. Barnard and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

On November 22, 1998, Willie Summers and the victim, Jamie Briggs, were at Summer's house in Huntsville, Alabama. When the appellant arrived, he tried to go inside, but Summer's mother, Virginia Summers, refused to allow the appellant inside her house because he was carrying a shotgun wrapped in a white sheet. The appellant put the gun into Summer's car, and the appellant, Summers, and Briggs went for a drive.

The trio drove around Huntsville looking for a Jeep Cherokee to steal. They planned to sell the vehicle to a "chop shop" in Birmingham, Alabama. After an unsuccessful search, the three

men decided to drive to Tennessee to steal car tire rims. The appellant, who claimed that he knew where they could find the rims, drove to Carpenter Hollow Road in Taft, Tennessee. The appellant parked the car, obtained a screwdriver from the glove compartment, and announced that he and Briggs would go and get the rims. Before the appellant left, Summers saw him remove something from the trunk of the car. Summers then moved from the back seat of the vehicle to the driver's seat. As the appellant and Briggs walked off, Briggs pulled the ski mask he was wearing down over his face.

Shortly thereafter, Summers heard four to six gunshots and heard Briggs scream. After the shooting ceased, the appellant came back to the car holding a shotgun and told Summers that he "killed that punk son of a bitch." Summers did not see Briggs again. The next morning, Briggs' body was found. Briggs was wearing the same ski mask he had worn the night before. He had been shot five times and died as a result of shotgun wounds to his head and to his left flank or hip.

Following the shooting, Summers and Briggs drove back to the appellant's residence, where Summers witnessed the appellant hide the gun and the gloves he was wearing under the hood of an old truck located in the appellant's backyard. The appellant wiped the shotgun with a rag before hiding the weapon.

The appellant was convicted by a jury in the Lincoln County Circuit Court of one count of first degree premeditated murder and was sentenced to life imprisonment in the Tennessee Department of Correction. On appeal, the appellant now challenges the sufficiency of the evidence underlying his conviction and further contests the admission into evidence at trial of the spent shotgun shell found in his yard. We will address these issues in reverse order.

## II. Analysis
### A. Suppression of the Spent Shotgun Shell

The appellant argues that "[t]he trial court should have excluded the shotgun shell found in [the appellant's] front yard because the shotgun shell was taken as a result of a warrantless search of [his] property and the taking of the shotgun shell does not fit any exception for taking an item while conducting a warrantless search." Our supreme court has stated that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, we note that this court will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Moreover, "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The facts underlying the seizure of the contested evidence are as follows: On November 24, 1998, Investigator Boeringer of the Lincoln County Sheriff's Department went to Huntsville, Alabama, and enlisted the assistance of Sergeant Charles Berry of the Madison County Sheriff's Department. Investigator Boeringer and Sergeant Berry then went to the appellant's

residence in Harvest, Alabama, to question the appellant because he was one of the last people to see Briggs alive. Both officers testified at the suppression hearing that they walked in the straightest line possible to the front door of the residence. The appellant's father, Morris Edward Pepper, told the officers that the appellant was not home. The officers left a business card with Pepper and asked Pepper to instruct the appellant to call them as soon as possible. The officers returned to the police vehicle by walking the same path that they had used to get to the front door. At the suppression hearing, Sergeant Berry testified that, "[a]s I left the front door, walking back to the patrol vehicle, I happened to glance down and observed a fired, red in color, shotgun shell casing, which I picked up." At trial, the following colloquy occurred between the State and Sergeant Berry:

> Sergeant Berry: As we were leaving the front door, traveling back to [Investigator] Boeringer's vehicle, we were traveling back across the front yard,[1] I just happened to glance down in my path back to the vehicle and seen a red shotgun shell that was fired laying on the ground in front of me.
>
> State: Now, . . . why was that of particular importance to you at that time in your life?
>
> Sergeant Berry: [Investigator] Boeringer had showed me the crime scene photographs of the murder victim before we had traveled to [the appellant's residence]. And I had noticed in the crime scene photographs several red shotgun shells there at the crime scene.

The Fourth Amendment to the United States Constitution proclaims that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated." Similarly, Article I, Section 7 of the Tennessee Constitution provides "[t]hat the people shall be secure . . . from unreasonable searches and seizures."[2] In order to challenge the reasonableness of a search or seizure, the appellant must first "establish a reasonable expectation of privacy in the place searched or property seized before [he] can challenge the constitutionality of the search." State v. Brenda Hill, No. 274, 1990 WL 111448, at *2 (Tenn. Crim. App. at Knoxville, August 7, 1990).

However, "neither the Fourth Amendment nor Article I, Section 7 protects what a citizen 'knowingly exposes to the public'. That which a citizen knowingly exposes to the public is that in which he . . . has not manifested subjective expectation of privacy." State v. Bowling, 867 S.W.2d 338, 341 (Tenn. Crim. App. 1993). This court has previously found that

---

[1] Both Investigator Boeringer and Sergeant Berry testified at the suppression hearing that they had to park in the appellant's driveway behind a parked pickup truck that was filled with garbage. From that point, because there was no walkway to the front door, the officers "took the shortest path from the vehicle to the front door. . . . Just diagonally across the yard."

[2] In State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citation omitted), our supreme court noted that "'article I, section 7 is identical in intent and purpose with the Fourth Amendment.'" For the purposes of this opinion, we consider the protection provided by these provisions to be coextensive.

"It cannot be said a person has an expectation of privacy in the area in the front of his residence which leads from the public way to the front door." A sidewalk, pathway or similar passageway leading from a public sidewalk or roadway to the front door of a dwelling represents an implied invitation to the general public to use the walkway for the purpose of pursuing legitimate social or business interests with those who reside within the residence. Police officers conducting official police business are considered members of the general public. What an officer sees from a vantage point along the walkway between the public road and the front door is not protected by either the Fourth Amendment or the state constitution.

State v. Harris, 919 S.W.2d 619, 623-624 (Tenn. Crim. App. 1995) (citations omitted).

The appellant argues that the conduct of the officers does not fall within the "plain view" exception to the warrant requirement. This court has previously observed that, typically,

"plain view" denotes an extension of a prior valid search and is distinguishable from a "look" or "open view." . . . [However,] "[t]here is a clear distinction between a look and a search. Whereas a search is afforded all the Fourth Amendment protections, a look . . . . includes those observations which are clearly visible, readily observable and open to public gaze."

State v. Johnson, 705 S.W.2d 681, 683 (Tenn. Crim. App. 1985). Therefore, because the officers were legitimately in a location where they had every right to be, there was no "search;" therefore, there was no need for a warrant or an exception to the warrant requirement. See State v. Layne, 623 S.W.2d 629, 635 (Tenn. Crim. App. 1981), overruled on other grounds by State v. Holt, 691 S.W.2d 520, 522 (Tenn. 1984).

Regardless of the existence of a "search," the appellant may still object to the seizure of the shotgun shell casing. The Supreme Court of the United States has explained that

our cases . . . hold that seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place. More generally, an officer who happens to come across an individual's property in a public area could seize it only if Fourth Amendment standards are satisfied--for example, if the items are evidence of a crime or contraband. . . . For the plain-view cases clearly state that, notwithstanding the absence of any interference with privacy, seizures of effects that are not authorized by a warrant are reasonable only because there is probable cause to associate the property with criminal activity. . . . In short, . . . such seizures must satisfy the Fourth Amendment and will be deemed reasonable only if the item's incriminating character is "immediately apparent."

Soldal v. Cook County, Illinois, 506 U.S. 56, 68-69, 113 S. Ct. 538, 547 (1992) (citations omitted). Sergeant Berry testified that the spent red shotgun shell that he saw at the appellant's residence appeared identical to the ones he had observed in photographs of the crime scene, making the shell's "incriminating character . . . 'immediately apparent.'" Id. Coupled with the fact that the appellant was one of the last people to see the victim alive, Sergeant Berry had probable cause to seize the shotgun shell casing. This issue is without merit.

## B. Sufficiency of the Evidence

The appellant challenges the sufficiency of the evidence supporting his conviction for first degree murder. Initially, we note that a jury conviction essentially removes the presumption of innocence the appellant enjoyed at trial and, on appeal, replaces it with a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Therefore, the appellant bears the burden of demonstrating to this court why the evidence will not support the jury's findings. Id. In order to meet this burden, the appellant must establish that no reasonable trier of fact could have found the essential elements of the offense in question beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

We also note that as the prevailing party in the trial court, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, the trier of fact, not this court, must resolve all questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). This remains the standard regardless of whether the State established the appellant's guilt through direct evidence, circumstantial evidence, or a combination of both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000), cert. denied, __ U.S. __, 121 S. Ct. 2600 (2001).

In order to sustain the appellant's conviction for first degree murder, the State needed to prove at trial that the appellant committed the "premeditated and intentional killing of [Briggs]." Tenn. Code Ann. § 39-13-202(a)(1) (1997). We observe that a homicide is initially presumed to be second degree murder, and the State then must prove premeditation in order to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999), cert. denied, 531 U.S. 837, 121 S. Ct. 98 (2000). Our code explains that "'premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Furthermore, Tenn. Code Ann. § 39-11-302(a) (1997) provides that "'[i]ntentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result."

This court has previously observed that a jury may infer premeditation from the appellant's planning activity prior to the killing, the appellant's motive for the killing, or the nature of the killing. State v. Jones, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999). Moreover, premeditation may be inferred from "the use of a deadly weapon upon an unarmed victim; the

particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); see also State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The primary evidence implicating the appellant in the murder of Briggs was the testimony of Summers, who asserted that, on the Thursday or Friday preceding the murder of Briggs on Sunday, the appellant said that he was going to kill Briggs. Additionally, Summers testified that, on the day of the murder, the appellant was armed with a shotgun. When the trio reached Carpenter Hollow Road, the appellant removed the gun from the trunk of Summers' car and carried the weapon with him when he and Briggs left the car. Summers maintained that, shortly after the appellant and Briggs walked off together, Summers heard several shotgun blasts and heard Briggs scream. After the shots, the appellant returned with the shotgun to Summers' car and told Summers that he "killed that punk son of a bitch." Summers drove the appellant home where he witnessed the appellant wipe the outside of the shotgun with a rag before hiding it under the hood of an old truck.

There was additional evidence which corroborated Summers' version of events. Summers' sister, Shirley Wright, testified that, on November 21, 1998, she drove the appellant to Larry's Pistol and Pawn. Wright further testified that she did not know what the appellant bought while inside the pawn shop, although he did mention that he needed to buy ammunition. Jonathan David White, a clerk at Larry's Pistol and Pawn, authenticated a document that indicated that the appellant had bought a twelve-gauge shotgun from the pawn shop on November 21, 1998. Summers' mother testified that the appellant came to her residence on November 22, 1998, the day of the murder, and that he was carrying a shotgun wrapped in a sheet. She conceded that she was not certain that it was a shotgun inside the sheet but stated that it appeared to be a shotgun. Furthermore, the body of Briggs was discovered on Carpenter Hollow Road in the location described by Summers. Medical examiner Dr. Charles Harlan testified that Briggs died as the result of five shotgun wounds, specifically explaining that Briggs' death was caused by the wounds to his head and left flank. See State v. Caldwell, 671 S.W.2d 459, 463 (Tenn. 1984). The wound to the victim's head occurred from a distance of three to five feet, and the wound to the victim's left flank occurred from a distance of six to nine feet. Both Dr. Harlan and Don Carmen, a Tennessee Bureau of Investigation (TBI) forensic firearms identification expert, maintained that Briggs' wounds were caused by shots from a twelve-gauge shotgun. Moreover, the spent shotgun shells discovered at the crime scene were of two brands: Estate and Winchester. Testimony revealed that, while the Winchester brand of ammunition is fairly common, Estate brand ammunition is somewhat rare. The spent shotgun shell discovered at the appellant's residence by Sergeant Berry was an Estate brand shell. Carmen testified that the six spent shotgun shells found at the scene of the crime and the Estate shell found at the appellant's residence by Sergeant Berry were all fired from the same shotgun. Additionally, Investigator Boeringer testified that the appellant had admitted that he killed Briggs but the appellant maintained that he did so in self-defense.

Statements made by the appellant both before and after the killing indicate that the appellant planned to kill Briggs. See Jones, 15 S.W.3d at 889. Additionally, the "shotgun blast to

-6-

the [victim's head] at close range demonstrates the [appellant's] intent to cause death and the jury could rationally conclude that was the [appellant's] conscious objective." Id. Moreover, "[t]he use of a deadly weapon upon an unarmed victim and declarations by the [appellant] of his intent to kill the victim may support the existence of premeditation." State v. Dewayne Jordan, No. W1999-01693-CCA-R3-CD, 2000 WL 1840076, at *5 (Tenn. Crim. App. at Jackson, December 6, 2000), perm. to appeal denied, (Tenn. 2001). Notably, Summers testified that Briggs did not have a weapon when Briggs got out of the car to go with the appellant to search for car rims to steal. See State v. James Wesley Osborne, No. E1999-01071-CCA-R3-CD, 2001 WL 667726, at *4 (Tenn. Crim. App. at Knoxville, June 14, 2001). Additionally, Summers maintained that, prior to the murder, the appellant had possession of a gun and had threatened Briggs. Id. Moreover, the appellant admitted after the killing that he "killed that punk son of a bitch" but did so "in self-defense." See Jones, 13 S.W.3d at 889; State v. J.B. McCord, No. 03C01-9403-CR-00110, 1997 WL 732513, at * 3 (Tenn. Crim. App. at Knoxville, November 26, 1997). Thus, the proof adduced by the State established that the appellant, intentionally and with premeditation, killed Briggs. This issue is without merit.

### III. Conclusion
Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE