[Crim. No. 23608. Dec. 31, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLAN NORMAN MAYOFF, Defendant and Appellant.

## COUNSEL

Marshall W. Krause, Krause, Timan, Baskin, Shell & Grant and Thomas C. Petersen for Defendant and Appellant.

Richard Jay Moller, Melvin B. Pearlston and Ronald M. Sinoway as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Eugene Kaster, Thomas Brady, Martin S. Kaye, Ronald E. Niver and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

John H. Darlington, District Attorney (Nevada), as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

GRODIN, J.—We recently concluded that, unless a warrant is obtained, our state Constitution forbids intensive aerial inspection of an individual enclosed backyard based on prior suspicions that marijuana cultivation will be found within the enclosure. (*People* v. *Cook* (1985) 41 Cal.3d 373 [221 Cal.Rptr. 499, 710 P.2d 299].)[1] In this case, we confront a different type of police activity. Under a program designed to curb widespread commercial marijuana farming in rural and semirural areas, law enforcement officials took to the air, in fixed-wing aircraft, to identify the locations of marijuana crops being grown in open fields. Flying at elevations from which the details of human activity could not be observed, they saw indications of what they believed to be marijuana growing in a remote area. While there were signs of human habitation nearby, and the officers took photographs to show the relationship between that habitation and the growing crop, it was the crop in the open field, and not defendant's residence or curtilage,

---

[1]The United States Supreme Court has since reached a contrary conclusion on the backyard aerial surveillance issue under the Fourth Amendment. (*California* v. *Ciraolo* (1986) — U.S. — [90 L.Ed.2d 210, 106 S.Ct. 1809].) The high court's ruling is discussed in greater detail below.

that was the principal focus of their attention. Under these circumstances we will conclude that defendant had no reasonable expectation that his land would be immune from such limited aerial surveillance, and that the surveillance was permissible under the United States and California Constitutions.

While we uphold the instant search on its facts, we recognize that a random surveillance and eradication program presents difficult constitutional and regulatory problems. Certain practices of the program operating in defendant's locale have already led to a successful class injunction suit. We invite the Legislature to participate in establishing standards which will balance the needs of law enforcement against the legitimate privacy expectations of affected citizens.

## FACTS

Aerial surveillance by the police revealed what they suspected were marijuana gardens growing on appellant Mayoff's land. Based on the aerial views, the police obtained a warrant for a ground search of the property. Under its authority, they seized a portion of appellant's marijuana crop. He was charged with one count of cultivation of marijuana. (Health & Saf. Code, § 11358.) He moved to set aside the information and suppress the evidence against him (Pen. Code, §§ 995, 1538.5), urging that the aerial surveillance of his property violated his constitutional rights of privacy, and against unreasonable searches and seizures. (U.S. Const., Amend. IV; Cal. Const., art. I, §§ 1, 13.) The trial court denied appellant's motions after a hearing, and he entered a plea of guilty. He was sentenced to six months in county jail and two years' probation. He now appeals, solely on the constitutional grounds rejected below.

The surveillance which led to discovery of appellant's crop was part of a program operated in several rural northern California counties where widespread commercial marijuana farming has taken root. The program is run jointly by local, state, and federal law enforcement personnel; it has been in effect in Humboldt County, where appellant resides, for approximately eight years. Fundamental to the scheme is a random pattern of warrantless flights over the entire county, focusing on rural areas. The flights are undertaken for the purpose of identifying plots of land on which it appears marijuana is being cultivated.[2] The viewing officers note such factors as the

---

[2]The Attorney General explains that this massive law enforcement effort stems from the magnitude of the cultivation problem, related incidents of violence, and the consequent dangers to normal recreational use of California's back country. As he notes, the 1983 final report of the joint state-federal Campaign Against Marijuana Planting (CAMP) estimates that 80 percent or more of rural marijuana growers in 14 participating counties guard their

color and spacing of plants, their relationship to nearby structures, signs of cultivation, and the location and general characteristics of the terrain under scrutiny. The vast majority of flights are made without prior information about the existence of marijuana at a particular location. The areas surveyed during a particular flight are selected almost entirely at random. "There is no exact pattern," one of the participating officers said at a preliminary hearing. "I mean, I just fly wherever I feel like flying. . . . No set pattern." During each flight, the viewing officer is "looking constantly" at the ground below.

Much of Humboldt County's terrain is extremely rugged and isolated. Appellant, like roughly one-tenth of the county's rural population of about 29,000, lives in territory so remote that it can be examined only from the air. His 40-acre parcel is in a mountainous, wooded region, almost a mile from the nearest paved road. It cannot be seen from the road, and is connected to it by a dirt path which winds its way toward the portion of the property on which appellant resides. Only the top of one of appellant's buildings is visible from the path, which abruptly ends shortly after connecting with a turnoff to his residence. This turnoff is so rocky it is difficult to traverse without benefit of a four-wheel-drive vehicle.

On July 23, 1980, Agent Brown of the California Department of Justice and Detective Vulich of the Humboldt County Sheriff's Department made an antimarijuana surveillance flight from Eureka to the Garberville area in southern Humboldt County. They had no search warrant and no prior suspicion marijuana was being grown on appellant's property. From an altitude of at least 1,000 feet, one of the officers noticed what he believed to be marijuana growing on appellant's land.

Nearly two weeks later, on August 4, 1980, Detective Vulich flew again over appellant's property in order to photograph the land below. Again, it appears that an altitude between 1,000 and 2,000 feet was maintained. Vulich still had no search warrant. Apparently using an 80-200 millimeter telephoto lens, he photographed the suspicious vegetation, two trailers parked on the property, and the surrounding area. On his return to police headquarters he showed the snapshots to Agent Brown, who then executed an affidavit in support of a search warrant. On August 15, 1980, the warrant

---

plots with firearms during the cultivation and harvest seasons to prevent "poaching." A number of deaths and serious injuries have resulted. (See, e.g., *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].) Some have involved innocent and accidental intruders. Moreover, precisely because the growers seek to operate in secret, they have retreated into remote areas, including public lands, traditionally frequented by hikers, campers, fishermen, and hunters. The transformation of rural tracts formerly open to recreational use into illegal armed camps posing a danger to innocent wanderers is a major social and environmental problem which itself implicates precious personal freedoms.

was served, and marijuana was in fact discovered on appellant's property, in two separate gardens and in one of the inhabited trailers. At least one garden was fenced, and both were surrounded by steep slopes and wilderness. There was no public vantage point on land from which the gardens or the trailers could be seen.

The aerial photographs introduced in evidence indicate that the gardens were at least 200 feet from the closest of the trailers. No fences formed a common enclosure around the trailers and the garden area.

DISCUSSION

*1. Warrantless aerial surveillance.*

In California, the legality of a warrantless police intrusion into allegedly private zones of activity depends on whether the government has "unreasonably" invaded an actual expectation of privacy which society is prepared to recognize as reasonable. (E.g., *Cook, supra,* 41 Cal.3d at p. 379; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 638 [108 Cal.Rptr. 585, 511 P.2d 33]; see *Katz* v. *United States* (1967) 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507].) All parties concede that defendant sought privacy for his residence and his marijuana gardens. They were on his private property in a remote area, away from ground-level vantage points open to the public. The gardens themselves, while not immediately adjacent to the residential structures, were carefully enclosed by fences and trees. The only issues, therefore, are whether defendant's wishes were objectively reasonable and, if so, whether the warrantless aerial observation invaded his expectations unreasonably.

Three recent cases bear on these questions but do not resolve them. The first such decision is *United States* v. *Oliver* (1984) 466 U.S. 170 [80 L.Ed.2d 214, 104 S.Ct. 1735]. In two separate incidents there under review, law enforcement agents, acting without warrants or probable cause, entered remote rural private property to look for marijuana cultivation. Noting that the land inspected in each instance was some distance from any home or business, the high court found no violation of the Fourth Amendment.

The *Oliver* majority conceded that the Fourth Amendment provides a high degree of privacy protection to the "curtilage" of a residence—"the land immediately surrounding and associated with the home." (P. 180 [80 L.Ed.2d p. 225].) However, it affirmed the long-standing rule (see *Hester* v. *United States* (1924) 265 U.S. 57 [68 L.Ed. 898, 44 S.Ct. 445]) that the federal Constitution allows the authorities to inspect areas beyond the curtilage—so-called "open fields"—at will, even where they trespass on private

property which was clearly intended to be shielded from the view of outsiders. (Pp. 176-184 [80 L.Ed.2d pp. 222-228].)

The five majority justices concluded that open fields are not among the "persons, houses, papers, and effects" described in the Fourth Amendment. (Pp. 176-177 [80 L.Ed.2d p. 223]; see *Hester, supra,* 265 U.S. at p. 59 [68 L.Ed. at p. 900].) Moreover, the *Oliver* majority reasoned, society is not prepared to recognize such areas as protected zones of intimate privacy, even where the individuals who seek privacy in such places have made that intention clear. (466 U.S. at pp. 179-184 [80 L.Ed.2d at pp. 224-228].)[3] Under *Oliver,* police observation of an open field, at least from the ground, simply is not a "search" subject to federal constitutional limitations.[4]

■ In *Cook, supra,* we subsequently confirmed that the California Constitution, like its federal counterpart, protects with special zeal the legitimate expectation of privacy within a residential curtilage. Law enforcement agents may not defeat that expectation, we ruled, by spying at will on a private yard from an aircraft.

We were not persuaded that police officers who examine a residence from the air are simply observing what is in "plain view" from a lawful public vantage point. Such reasoning, we explained, ignores the essential difference between ground and aerial surveillance. One can take reasonable steps to ensure his yard's privacy from the street, sidewalk, or neighborhood, and police on the ground may not broach such barriers to gain a view of the enclosed area. But there is no practical defense against aerial spying, and precious constitutional privacy rights would mean little if the government could defeat them so easily.

■ Even if members of the public may casually see into his yard when a routine flight happens over the property, we concluded, a householder does not thereby consent to focused examination of the curtilage by airborne police officers looking for evidence of crime. No law enforcement interest justifies such intensive warrantless government intrusion into a zone of heightened constitutional privacy. (41 Cal.3d at pp. 379-385.)

---

[3]Justice Powell's majority opinion was joined by the Chief Justice and by Justices Blackmun, Rehnquist, and O'Connor. The sixth member of the majority, Justice White, concurred only in the "persons, houses, papers, and effects" analysis. He declined to reach the issue whether one could have a reasonable expectation of privacy in an open field. (*Id.,* at p. 184 [80 L.Ed.2d at p. 228].)

[4]*Oliver* did not present the issue whether the police may survey open fields at will from the air. However, the majority found little merit in the landowners' complaints about ground inspection of their open fields, since they conceded "that the public and police lawfully may survey lands from the air." (P. 179, fn. omitted [80 L.Ed.2d p. 224]; see discussion *post.*)

*Cook* was decided exclusively under the California Constitution. A more recent United States Supreme Court decision, *California* v. *Ciraolo, supra,* — U.S. — [90 L.Ed.2d 210], has ruled that warrantless aerial surveillance of the curtilage does not contravene the Fourth Amendment.

In *Ciraolo,* as in *Cook,* one convicted on a marijuana charge urged that the police violated his constitutional rights when they examined his enclosed backyard from an airplane to confirm vague suspicions that he was engaged in illegal cultivation. Over a vigorous dissent, a bare majority of the high court disagreed. However private the curtilage in other contexts, the majority said, the realities of air travel force a modern householder to assume that his yard and anything in it are in plain view from the air. (— U.S. at pp. — —— [90 L.Ed.2d at pp. 215-218] [see also dis. opn. by Powell, J., at p. — et seq. (90 L.Ed.2d at p. 218 et seq.)]; cf., *Dow Chemical Co.* v. *United States* (1986) — U.S. — [90 L.Ed.2d 226, 235-238, — S.Ct. —].)

■ Our state charter is a "document of independent force" (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099]), and its guarantees "are not dependent on those [provided] by the United States Constitution" unless a contrary intent appears. (Cal. Const., art. I, § 24.) We grant "respectful consideration" to constitutional interpretations of the United States Supreme Court, but they are to be followed in California "only where they provide no less individual protection than is guaranteed by California law." (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) On many occasions, we have concluded that the California Constitution accords greater protection to individual rights within our borders than federal law guarantees throughout the nation. (E.g., *People* v. *Bustamonte* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 246-252 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].)

Having carefully examined the majority decisions in *Ciraolo* and *Dow Chemical,* cited *supra,* we find ourselves unconvinced by their reasoning. We adhere to our holding in *Cook.* The question remains whether the federal and state Constitutions nonetheless permit the "random" rural aerial surveillance at issue in this case.

Before *Oliver* was decided, California courts displayed some uncertainty about whether the "open fields" doctrine had survived the intervening principle of *Katz, supra,* that "the [Constitution] protects people, not places" and may shield "what [a person] seeks to preserve as private, even in an area accessible to the public . . . ." (389 U.S. at p. 350 [19 L.Ed.2d at p. 582]; compare, e.g., *People* v. *Krivda* (1971) 5 Cal.3d 357, 364-365

[96 Cal.Rptr. 62, 486 P.2d 1262] [what person seeks to preserve as private, even in public area, may be constitutionally protected]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1101 [80 Cal.Rptr. 633, 458 P.2d 713] [whether place such as "open field" is or is not "constitutionally protected area" does not necessarily determine reasonable expectation of privacy]; *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421, 425-430 [158 Cal.Rptr. 86] [secluded "open field" on private property protected from ground, but not air, inspection]; and *Phelan* v. *Superior Court* (1979) 90 Cal.App.3d 1005, 1011 [153 Cal.Rptr. 738] [expectation of privacy in remote rural marijuana garden is reasonable if desire for privacy is exhibited] with *People* v. *Dumas* (1973) 9 Cal.3d 871, 881-882, fn. 9 [109 Cal.Rptr. 304, 512 P.2d 1208] ["open fields" are among places so public that search is justified without warrant or exigency]; *People* v. *Scheib* (1979) 98 Cal.App.3d 820, 826-827 [159 Cal.Rptr. 665] [citing *Dumas*]; and *People* v. *Ketchum* (1975) 45 Cal.App.3d 328, 330 [119 Cal.Rptr. 368] [same].)

However, pre-*Oliver* California cases consistently upheld warrantless surveillance of rural marijuana gardens from airplanes flying at normal altitudes, even when surveillance was part of a "random" overflight program, employed optical aids, and inspected homes or human activities near the gardens. Interpreting *Katz* in a manner which anticipated *Oliver,* the Courts of Appeal reasoned that common habits in the use of agricultural and woodland property preclude any *reasonable* expectation that crops growing there will not be seen from legal aerial vantage points by the public or the police. (*Dean* v. *Superior Court* (1973) 35 Cal.App.3d 112, 114, 117 [110 Cal.Rptr. 585] [patch located "in an isolated area of the Sierra foothills, . . . hidden from view by the surrounding hills and woods"]; see also *People* v. *Egan* (1983) 141 Cal.App.3d 798, 800, 806 [190 Cal.Rptr. 546] [overflight of ranch prompted by rumors of marijuana cultivation; "[t]he appellate courts of this state have consistently upheld aerial surveillance from lawful altitudes over rural and relatively unpopulated property. . . ."]; *Tuttle* v. *Superior Court* (1981) 120 Cal.App.3d 320, 327 [174 Cal.Rptr. 576], cert. den., 454 U.S. 1033 [70 L.Ed.2d 477, 102 S.Ct. 571] ["Tents, 'other structures,' vehicles, and people . . . observed" near rural garden area; trails led from structures to garden]; *People* v. *Joubert* (1981) 118 Cal.App.3d 637, 640-641 [173 Cal.Rptr. 428] [binoculars used; "outbuildings resembling barns [and a] 'predominant house'" observed within 29-acre parcel; house was "focus of particular attention" by observers]; *People* v. *St. Amour* (1980) 104 Cal.App.3d 886, 889-893 [163 Cal.Rptr. 187] [Humboldt County random surveillance program; plants seen "on a mountain slope in a deserted area" a mile and a half from nearest town; though "no business or other human activities were observable," the site included a tent]; *Burkholder, supra,* 96 Cal.App.3d at pp. 423-425 [Santa Cruz County random surveil-

lance program; binoculars and telephoto camera used; garden observed "in a heavily wooded, mountainous area"].)

Courts in other jurisdictions have applied similar principles to uphold, under a wide variety of circumstances, warrantless aerial surveillance for marijuana in rural areas. (*United States* v. *Allen* (9th Cir. 1980) 675 F.2d 1373, 1380-1381, cert. den. (1981) 454 U.S. 833 [70 L.Ed.2d 112, 102 S.Ct. 133] [helicopter surveillance with binoculars and telephoto lenses; seacoast ranch routinely traversed by Coast Guard helicopters for law enforcement purposes; prior site-specific suspicion of drug smuggling]; *United States* v. *DeBacker* (W.D.Mich. 1980) 493 F.Supp. 1078, 1081 ["isolated" episodes of surveillance over farm in "boondocks" at altitudes as low as 50 feet and distances as near as 40 feet to one of working farmhands; public overflights at low altitudes "not uncommon"]; *Diehl* v. *State* (Fla.App. 1984) 461 So.2d 157, 158 [no reasonable expectation of privacy from aerial observation of "open field" (citing *Oliver*)]; *State* v. *Bigler* (1983) 100 N.M. 515 [673 P.2d 140, 141] [unaided aerial view of cornfield containing marijuana; no reasonable expectation of privacy from airplanes; municipal airport nearby and low-altitude cropduster flights common]; *State* v. *Stachler* (1981) 58 Hawaii 412 [570 P.2d 1323, 1325-1329] [random surveillance; binocular-aided helicopter view of marijuana patch 15 feet from house on remote and secluded 4-acre parcel; helicopter's maintenance of legal altitude (300 feet) and frequency of overflights by other aircraft contribute to finding of no reasonable privacy expectation]; *State* v. *Davis* (1981) 51 Ore.App. 827 [627 P.2d 492, 493-494] [airplane flying at 600-700 feet observed marijuana patch 150-300 feet from dwellings on defendant's locked, posted, and secluded land in somewhat populated area; no reasonable expectation of privacy even though aircraft's altitude violated F.A.A. regulations]; *State* v. *Layne* (Tenn.Crim.App. 1981) 623 S.W.2d 629, 632-636 [helicopter surveillance of rural field containing 5 persons from altitude of 1,800 feet; marijuana observed by police from legal aerial vantage point is in "open view"]; see *People* v. *Lashmett* (1979) 71 Ill.App.3d 429 [27 Ill.Dec. 657, 389 N.E.2d 888, 890-894], cert. den. (1980) 444 U.S. 1081 [62 L.Ed.2d 765, 100 S.Ct. 1034] [observation of stolen tractor from legal height of 2,400 feet; rural field away from house and curtilage; "open field" doctrine applies].)

■ For state as well as federal purposes, we accept *Oliver*'s premise that there is a greater legitimate expectation of privacy within the home and curtilage than in "open fields." We agree that the "curtilage," under both the state and federal Constitutions, is confined to those outdoor areas "immediately adjacent to the home" to which extend "the intimate activity associated with the 'sanctity of a [person's] home and the privacies of life' [citation omitted] . . .''; outdoor places beyond this adjacent and intimate

zone are "open fields." (*Oliver, supra,* 466 U.S. at p. 180 [80 L.Ed.2d at p. 225]; see also p. 182, fn. 12 [80 L.Ed.2d at p. 226].)

■ Moreover, we conclude, as prior cases have suggested, that there can be no reasonable expectation of absolute privacy from warrantless aerial surveillance by the police of crops growing in open fields. Insofar as the open fields are observed from sufficient altitude to prevent disruption or detailed observation of individual activities below, the fields are in "plain view" from the air, and aerial surveillance for illegal cultivation there is not a "search" governed by either Constitution.[5]

■ In our view, the crop at issue here lay outside the curtilage, in an open field. We recognize that some decisions have defined rural curtilages expansively. Yet we are not persuaded that the cultivation which drew the officers' attention here was within a zone of heightened privacy.

The suspicious vegetation was seen in a secluded, mountainous area, some 200 or more feet from trailers which might be residences. While the cultivated area was shielded from ground-level vantage points outside appellant's property, it was not in an area "immediately adjacent" to the trailers "to which . . . the intimate activity associated with the 'sanctity of a man's home and the privacies of life'" could be expected to extend. There was no physical indication, such as a common enclosure, that the trailers and gardens were considered a common zone of private residential activity.

■ Appellant urges that, even if his crop was therefore in an open field, the officers' simultaneous scrutiny of his house and curtilage was an invalid warrantless search. That impropriety, appellant asserts, requires suppression of the marijuana discovery. For several reasons, we cannot accept this premise.

The surveying officers admitted that they did not avert their eyes from the terrain surrounding the suspicious cultivation, and the aerial photos presented to the magistrate depict not only the garden itself, but the nearby trailers, hillsides, trails, and roads. One officer conceded he unavoidably

---

[5]For federal purposes, our conclusion seems virtually compelled by *Oliver's* remark that appellants there had "concede[d]" the right of the police to "survey lands from the air" (466 U.S. at p. 179 [80 L.Ed.2d at p. 224]; see fn. 4, *ante*), and by the recent holding in *Ciraolo* that the right of aerial surveillance extends even to the curtilage. However, we do not necessarily accept, for purposes of the California Constitution, *Oliver's* ruling that law enforcement agents may constitutionally conduct warrantless *ground* searches of open fields even where they physically trespass upon private land. *Aerial* surveillance of crops in fields, from the visual distances we suggest, is not a trespass, and it is substantially less likely than a ground search to infringe on legitimate private activities taking place within open fields.

examined the apparently inhabited zone, since "the eye did encompass quite a bit."

It is clear, however, that the focus of the examination for criminal activity was the cultivated area outside the curtilage. The officers saw nothing criminal within the curtilage, and it appears that their primary interest in noticing this area was to establish its relationship, if any, to the outlying crops. ■ The observations took place from over 1,000 feet above defendant's property. The officers testified that the photographs presented to the magistrate, though some may have been taken with telephoto equipment, accurately show the scale of objects as they appeared to the naked eye.[6] If that is so, the details of human activity could scarcely have been discernible from the aircraft. All the photographs reveal is evidence that inhabited structures *exist* in the vicinity, and that they may be related to cultivation in open fields. The most casual passing airplane could see as much.

■ We think that observation of crops growing in open fields is not transformed into an unconstitutional search when the officers incidentally and unavoidably observe the *existence* of a nearby home and curtilage, and its relationship to the fields, from a visual altitude at which the possibility of intrusion on private activities below is remote.[7]

Our holding here is distinguishable from that of *Cook, supra*. There we prohibited *all* warrantless aerial scrutiny of a residential curtilage for the particular purpose of confirming a suspicion that criminal activity is taking place there. ■ There is a difference, significant for constitutional purposes, between surveillance focused on a particular residential yard, on

---

[6]While we are concerned with the use of optical enhancers, it does not appear feasible to impose a blanket rule prohibiting their employment from aircraft. We establish the principle that the aircraft must maintain a visual distance sufficient to obscure the details of human activity below. Optical enhancers may not be used to shorten that visual distance. (Cf., *People* v. *Arno* (1979) 90 Cal.App.3d 505, 510-512 [153 Cal.Rptr. 624].) On the other hand, the safest, most practical, and least intrusive method of surveillance may sometimes be to fly well above the minimum permissible altitude for naked-eye observations, then to utilize magnifying devices to compensate for the increased distance. Here, we are persuaded that use of the telephoto lens did not unreasonably infringe on legitimate privacy on defendant's property.

Nor do we accept defendant's suggestion that use of a camera is impermissible, since it allows scrutiny of the photographed area "at leisure." For federal purposes, the United States Supreme Court has recently concluded that an optical device which "enhanced somewhat" the details visible to the naked eye from a passing aircraft did not raise constitutional concerns. (*Dow Chemical, supra*, — U.S. at p. — [90 L.Ed.2d at p. 238].) The photos here, taken with a garden-variety 35 millimeter camera, show no potential for useful enhancement or magnification.

[7]But cf., *Ciraolo, supra*, dissenting opinion of Powell, J., — U.S. at page — [90 L.Ed.2d at page 224] (citing necessarily "indiscriminate" nature of aerial surveillance and photography as "serious threat" to "privacy interests in the home").

the one hand, and, on the other, surveillance which concentrates on open fields and merely notices their relationship to nearby habitation. In the former case, represented by *Cook,* there is no independent justification for the overflight; in the latter, the open fields doctrine provides an initial justification for the officers' airborne presence. Moreover, in the *Cook* situation, the intensity and focused nature of the observation, even if it occurs from substantial altitudes, enhances the danger that innocent activities occurring within a legitimate zone of protected privacy will be unreasonably infringed.

■ Finally, we cannot ignore the differing law enforcement interests involved. The inquiry whether particular privacy expectations are "reasonable," and whether government has intruded upon them "unreasonably," involves a weighing of the competing privacy and law enforcement interests. (See, e.g., *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 336 [83 L.Ed.2d 720, 731, 105 S.Ct. 733] and conc. opn. of Blackmun, J., at 469 U.S. at p. 351 [83 L.Ed.2d at p. 741]; *United States* v. *Martinez-Fuente* (1976) 428 U.S. 543, 560-567 [49 L.Ed.2d 1116, 1129-1134, 96 S.Ct. 3074]; *United States* v. *Brignoni-Ponce* (1974) 422 U.S. 873, 883-884 [45 L.Ed.2d 607, 617-618, 95 S.Ct. 2574]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868]; *People* v. *Scott* (1978) 21 Cal.3d 284, 292-293 [145 Cal.Rptr. 876, 578 P.2d 123].)

The People advise, and appellant does not dispute, that Humboldt County's random surveillance program was prompted by the rise of a large-scale illegal marijuana cultivation industry in remote areas of the county. There have been serious consequences, the People suggest, for the safety of law-abiding residents and visitors. Precisely in order to avoid discovery, the growers have retreated to places where detection from the ground is difficult or impossible. Persons who do approach a cultivated plot face the prospect of armed resistance. (See fn. 1, *ante.*) Secure in their weapon-enforced privacy, the farmers pursue their illicit trade unhindered.

Aerial surveillance of these remote, inaccessible, and dangerous areas may be the only feasible means of confronting this extraordinary law enforcement problem. Aerial surveillance also seems the least intrusive way of doing so, since it does not physically impinge at close range upon persons or private premises. (See discussion, *ante.*)

■ In our view, mere suspicion that marijuana is growing in the enclosed backyard of a single residence can never justify a warrantless aerial invasion of the enclosure. On the other hand, we do not believe that airborne police officers infringe "unreasonably" on legitimate privacy in homes and curtilages by merely observing the configuration of nearby structures while patrolling open fields for large-scale marijuana cultivation. We conclude

that the surveillance here at issue did not violate appellant's constitutional rights.[8]

In so holding on these facts, we do not minimize the difficulties involved in keeping a random surveillance program of this kind within proper bounds. At the behest of irate citizens, a United States District Court has already enjoined certain overreaching surveillance practices of the Humboldt County program. (*Nat. Org. for Reform of Marijuana Laws* v. *Mullen* (N.D.Cal. 1985) 608 F.Supp. 945.) In the wake of Proposition 8, such civil actions may prove the most effective bulwark against violations of the state Constitution by agents of law enforcement.[9] A principal advantage of this form of enforcement is that all parties will have a full opportunity to present facts bearing on the constitutional reasonableness of a particular surveillance program.

Perhaps the most significant protection for the privacy interest of innocent citizens would be the development of regulatory standards which prescribe and limit the manner in which overflights may be conducted. Such standards would have multiple advantages: they would, among other things, provide law enforcement personnel with a clear guide to the exercise of their discretion; serve as a basis for internal discipline in the event of violation; and

---

[8]Appellant suggests another means by which the competing law enforcement and privacy interests might be balanced. He proposes that random aerial surveillance which includes homes and curtilages is a "search" but might be justified by an "area" surveillance warrant obtained under somewhat relaxed standards of probable cause. (Cf., e.g., *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 535-539 [18 L.Ed.2d 930, 939-941, 87 S.Ct. 1727].) Under this approach, the authorities would have to persuade a neutral magistrate in advance that particular overflights were constitutionally justified. Officers would not, however, be required to demonstrate probable cause to believe that marijuana was growing on every parcel, or any particular parcel, within the anticipated surveillance zone.

The suggestion is appealing at first glance. The warrant clause is the Constitution's most important safeguard against overzealous government intrusions on legitimate privacy. Nonetheless, a majority of this court have concluded that the proposal must be rejected. It would impose upon law enforcement agencies a cumbersome two-step procedure, with one warrant necessary to permit the initial aerial surveillance, then, in most cases, another to authorize any subsequent ground search. Moreover, we find it difficult to conceive what advance information the officers could provide that would assist the magistrate, except in the most extreme cases, to evaluate the probable merit of a particular proposed overflight. Nor is a magistrate in a position to prejudge the infinite variations in altitude, distance, flight pattern, and air speed which might arise from conditions faced by the aircraft's pilot.

[9]Proposition 8, adopted by the voters on June 8, 1982, added section 28, subdivision (d) (hereafter section 28(d)) to article I of the California Constitution. Section 28(d) provides, with certain exceptions, that "relevant evidence" shall not be excluded from a criminal proceeding. One effect of section 28(d) is to prohibit application of the "exclusionary rule" to evidence gathered in violation of the state Constitution's search and seizure clause (art. I, § 13) unless exclusion is compelled by federal constitutional law. (*In re Lance W.* (1985) 37 Cal.3d 873, 888-890 [210 Cal.Rptr. 631, 694 P.2d 744].) Proposition 8 applies only to crimes committed after its passage. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

establish a foundation for meaningful judicial review. Most of all, publicly announced standards would reassure householders who seek legitimate privacy in their homes and yards, thus promoting that peace of mind which is an important ingredient of ordered liberty. (See Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 416 et seq.; Mertens, *The Fourth Amendment and the Control of Police Discretion* (1984) 17 U. Mich. J.L. Ref. 551, 553-563.) Such standards may of course be established by the Legislature, but we encourage the law enforcement agencies responsible for marijuana surveillance overflights to adopt them as administrative regulations in the first instance. (Cf., *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 538 [18 L.Ed.2d 930, 940-941, 87 S.Ct. 1727].) Indeed, in the event of a civil lawsuit aimed at curbing abuse (see discussion, *ante*), the existence or nonexistence of such standards may be considered an important factor in determining the appropriateness of injunctive relief. (See, e.g., *Stark* v. *Perpich* (D.Minn. 1984) 590 F.Supp. 1057 [injunction against drunk driving survey checkpoint denied where promulgation of standards minimized police discretion]; Note, *Curbing the Drunk Driver Under the Fourth Amendment: The Constitutionality of Roadblock Seizures* (1983) 71 Geo. L.J. 1457.)

### 2. Aerial identification of marijuana plants.

Appellant urges that probable cause for issuance of the warrant was not established, since it is impossible to identify marijuana plants from altitudes of 1,000 feet and above. Both Agent Brown, who was the warrant affiant, and Detective Vulich testified that their opinions arose from the evidence of cultivation—that the suspected plants were lusher green than the surrounding vegetation, spaced evenly and established in orderly rows in an area of "disturbed" earth. Moreover, the officers noted, the plants were within an enclosed area some distance from the structures on the property and connected to the structures by footpaths. Both officers admitted they could not distinguish the individual shapes or characteristics of the plants.

At the preliminary hearing, a botanist, Dr. Norris, testified that marijuana has no unique color which distinguishes it from other cultivated crops.[10] It is impossible, said Dr. Norris, to determine from 1,000 feet the identity of common plants under cultivation.

---

[10]Two suppression hearings were held, one at the preliminary hearing and one in the superior court. (See Pen. Code, § 1538.5, subds. (b), (i).) By stipulation, the preliminary hearing transcript was admitted in the superior court hearing.

However, the officers were permitted to use their experience in marijuana detection,[11] and their common sense, to form their opinions. Both emphasized that it was a combination of factors which aroused their suspicions. Agent Brown noted, for example, that the distance from the gardens to the trailer structures was a common pattern for marijuana in particular. The multiple well-worn footpaths connecting the structures to the garden suggested intense activity in the relatively small cultivation area. Moreover, the size and spacing of the plants, the remoteness and ruggedness of the terrain, the temporary look of the structures on the property, and the prevalence of marijuana cultivation in just such settings, all could contribute to a strong inference that this was the crop growing on appellant's land. The superior court's resolution of any factual dispute over ability to identify was thus substantially supported, and we cannot disturb it. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)[12]

### 3. Probable cause to search multiple dwellings.

■ The warrant affidavit executed by Agent Brown described appellant's property as including a "structure" with a "light colored roof" and another nearby "structure . . ., possibly a mobil [*sic*] trailer." It indicated that paths ran from each structure to the gardens, leading Brown to believe that the "occupant(s)" controlled the cultivated areas. The affidavit sought permission to search both structures because, in Brown's experience, commercial marijuana growers typically use "their houses and other outbuildings" to dry, cure, store, and hide their crops. The warrant issued on that basis.

When the warrant was executed, *both* structures turned out to be trailers used as residences. Both were searched; in the larger, used by appellant and his wife, marijuana and documents were found. Appellant argues that the warrant was fatally defective because the affidavit failed to establish *independent* probable cause for the search of *multiple* dwellings.

We cannot agree. In the first place, contrary to appellant's assertion, there is no indication that Agent Brown negligently or intentionally omitted the

---

[11]Agent Brown testified that he had always been vindicated by any ground examination of his past aerial observations; everything observed as marijuana from the air turned out to be marijuana when later examined on the ground. Detective Vulich reported a similar success rate in numerous cases.

[12]Appellant notes the comment in *People* v. *Joubert, supra,* 118 Cal.App.3d 637, that optically aided identification of crops in open fields is permissible because, as the cases demonstrate, "the plants cannot truly be identified as marijuana at reasonable altitudes without the aid of binoculars; . . ." (P. 646.) However, probable cause, not certain identification, is the issue. We are not persuaded that officers observing from "reasonable altitudes" with the naked eye alone lack all basis for forming a strong and reasonable suspicion, even if they cannot see each stalk, leaf, and bud. The plants are sizeable; indeed, the record is rife with indications that, at maturity, they can exceed 20 feet in height.

fact of multiple dwellings from the warrant affidavit. (See *People* v. *Kurland* (1980) 28 Cal.3d 376, 387-388 [168 Cal.Rptr. 667, 618 P.2d 213], cert. den., 451 U.S. 987 [68 L.Ed.2d 844, 101 S.Ct. 2321].) *Detective Vulich* testified that both structures looked like dwellings *to him* from the air, but there is no evidence that this opinion was shared with, or by, Agent Brown. (Cf., *United States* v. *Rios* (10th Cir. 1979) 611 F.2d 1335, 1347.)

Moreover, any omission in that regard neither undermined probable cause nor made the warrant affidavit "materially misleading." (*Kurland, supra,* 28 Cal.3d at p. 385.) There was ample information from which the magistrate could reasonably conclude that both structures were connected to the cultivation activities on the parcel, and that both were likely to contain criminal evidence. (Compare *People* v. *Joubert, supra,* 118 Cal.App.3d 637, 649-650 [affidavit described "dwelling places and/or outbuildings" on a 28-acre parcel but stated affiant's opinion only that "the dwelling house" contained criminal evidence]; *People* v. *Sheehan* (1972) 28 Cal.App.3d 21, 24-26 [103 Cal.Rptr. 201] [warrant to search "all structures, tents, lean-tos, and campsites" on 315-acre communal ranch, based on discovery of marijuana patch not near any dwelling].)

The judgment is affirmed.

Mosk, J., and Reynoso, J., concurred.

Broussard, J., concurred in the judgment.

**LUCAS, J.**—I concur in the judgment. As I explained in my dissenting opinion in *People* v. *Cook* (1985) 41 Cal.3d 373, 386 [221 Cal.Rptr. 499, 710 P.2d 299], aerial surveillance conducted at a reasonable height and in a nonintrusive manner cannot be deemed an "unreasonable" search under the California Constitution. That analysis would apply whether the officers surveyed a backyard and "curtilage," as in *Cook,* or mere "open fields," as here. Police surveillance which is limited to detecting growing marijuana plants simply cannot be deemed "unreasonable" conduct.

As the majority observes, it is unquestionable that the *federal* Constitution would not invalidate a warrantless aerial search, whether of open fields (see *United States* v. *Oliver* (1984) 466 U.S. 170, 176-184 [80 L.Ed.2d 214, 222-228, 104 S.Ct. 1735]), or of an enclosed backyard (*California* v. *Ciraolo* (1986) — U.S. — [90 L.Ed.2d 210, 106 S.Ct. 1809]). I would reach the same result under the *state* Constitution. Indeed, were this case governed by Proposition 8, which added section 28, subdivision (d), to the state Constitution, we would be compelled to reach that result (at least insofar as application of the state exclusionary rule is concerned). Only because

this case and *Cook* arose *prior* to the adoption of Proposition 8 must we consider whether the searches conducted in those cases violated state constitutional requirements.

**BIRD, C. J.**, Dissenting.—Today a majority of this court sanction an unparalleled program of indiscriminate aerial surveillance of the property, homes and persons of innocent citizens by the government. The opinion rejects appellant's challenge by concluding that the government's warrantless examination of his home and curtilage in the course of its random surveillance did not infringe upon any legitimate expectation of privacy. I do not agree.

The majority's holding is remarkable given our recent opinion in *People v. Cook* (1985) 41 Cal.3d 373 [221 Cal.Rptr. 499, 710 P.2d 299]. There, this court held that the aerial surveillance of defendant's curtilage was an unconstitutional search under article I, section 13 of the state Constitution. Here, the majority conclude that the arguably more intrusive surveillance of Mr. Mayoff's yard did not even constitute a search. This contradictory result not only makes the significance of the *Cook* holding uncertain, but brings confusion where clarity is needed. Those law enforcement agencies seeking to conform their aerial surveillance programs to constitutional requirements will find little guidance in today's opinion. Moreover, residents of the many California counties with programs of random surveillance will enjoy no assurance that they may utilize their yards without unwarranted government intrusion.

This case aptly illustrates the dangers inherent in analyzing privacy interests according to the discredited "protected areas" approach. By focusing on what they consider to be the "diminished privacy" expectations in the area where the marijuana was discovered, the majority lose sight of the scope of the invasive conduct. In addition to their faulty analysis, the majority reach their result by drastically misreading the record or ignoring it completely. Let me explain.

The record reflects that a police aircraft was making a random search for marijuana under cultivation. The officers had no reason to believe that they would find such cultivation on appellant's property or on any other specific property. The Attorney General does not dispute that appellant's home, surrounding land and a nearby structure were examined and photographed when the property fortuitously came within the sights of the airborne officers. He also does not dispute that these areas were hidden from public view.

It is well settled that a warrantless *ground* search of appellant's curtilage would have been per se unreasonable. (See *Lorenzana* v. *Superior Court*

(1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].) The Attorney General, however, asserts an unlimited right to examine residential property from the air. He claims this surveillance may be conducted *randomly*, even though such a program of surveillance would necessarily intrude upon the property of innocent persons.

The Attorney General raises two arguments to support his claims. He argues that appellant's curtilage was in plain view of the airborne officers and that the prevalence of air traffic precluded a reasonable expectation of privacy from aerial surveillance. These same arguments were advanced in *Cook* and were firmly rejected. (See *Cook, supra,* 41 Cal.3d at pp. 380-385.)

The Attorney General raises an additional argument which was not applicable in *Cook*. He maintains that expectations of privacy are not reasonable in open fields. Since the marijuana gardens were located in an open field, the examination of appellant's curtilage was of no significance. According to him, privacy interests "are not resurrected in a *field* by the otherwise irrelevant observation of some other place such as a rooftop or backyard." (Original italics.) The majority adopt this reasoning and uphold the surveillance of appellant's property.

According to the majority opinion, this activity by the police did not infringe upon Mr. Mayoff's privacy interests in the lands surrounding his home since, although one agent "unavoidably examined the apparently inhabited zone," the "focus of the examination for criminal activity was the cultivated area outside the curtilage." (Maj. opn., *ante,* at p. 1316.)[1] The majority's conclusion presumes (1) that the officers only inadvertently or incidentally looked into a curtilage and (2) that no warrant is required

---

[1]Since the record clearly shows that the police infringed upon appellant's reasonable expectations of privacy in the area immediately surrounding his home, it is unnecessary to address the majority's conclusion that the garden sites were located in an open field. It is not clear, however, how it could have been at once apparent to the officers in the air that appellant's home and the gardens were functionally related and at the same time obvious that the gardens were not part of appellant's curtilage (maj. opn., *ante,* at p. 1319), especially given that courts have found areas much more distant than these gardens to be within the curtilage. (See *United States* v. *Van Dyke* (4th Cir. 1981) 643 F.2d 992 [honeysuckle patch beyond mowed lawn and 150 feet from rural residence within the curtilage]; *Sanders* v. *State* (1978) 264 Ark. 433 [572 S.W.2d 397] [marijuana and vegetable garden separated from house trailer by a fence and lying 100 to 200 yards from the trailer within the curtilage]; *Norman* v. *State* (1975) 134 Ga.App. 767 [216 S.E.2d 644] [small meadow behind a barn which was itself located 100 feet from a farm house within the curtilage]; *Brinlee* v. *State* (Okla.Crim.App. 1965) 403 P.2d 253 [lot adjacent to barn and 100 yards from house within the curtilage]; *Walker* v. *United States* (5th Cir. 1955) 225 F.2d 447 [barn 70 to 80 yards from dwelling and separated from house by a private driveway within curtilage].)

if scrutiny of the curtilage occurs in the course of surveillance which is "focused" on discovering marijuana being cultivated beyond the curtilage.

The majority's first premise totally ignores the fact that the officers participating in the surveillance of the property acknowledged that they examined the *curtilage* for evidence of criminal activity. The majority also disregard the prosecution witnesses' extensive testimony which established that a detailed inspection of residences and their surrounding areas was an essential element of the aerial identification of marijuana. Further, the majority discount the significance of the evidence showing that an intrusion upon the curtilage commonly occurs in the course of the current program of indiscriminate aerial surveillance.

The majority's second premise misses the point as to the fundamental principles of search and seizure analysis. One need only look to *People* v. *Cook, supra,* 41 Cal.3d 373, to find the correct analytical framework. There, our court stated: "Determining the legality of warrantless police forays into allegedly private zones of activity was once almost exclusively a matter of ascertaining the scope of the property interests of the individual whose privacy was purportedly invaded. [Citations.] However, in 1967, *Katz* v. *United States* [1967] 389 U.S. 347, affirmed that constitutional limitations on police searches and seizures protect 'people, not places.' (P. 351.) [¶] Under the *Katz* standard as applied in California, the propriety of a warrantless governmental surveillance has come to encompass an assessment of the reasonableness of the individual's expectation of privacy in a particular situation, wherever he is, and whether or not government agents trespassed physically on his property interests. [Citations.] The inquiry is whether the government intruded unreasonably on an expectation of privacy which society is prepared to recognize as valid. [Citation.]

"Though location is no longer the *sine qua non* of search-and-seizure analysis, it remains relevant under the *Katz* test. The privacy one is entitled to expect in a particular place is governed primarily by common habits in the use of such property. [Citations.] [¶] Thus, we guard with particular zeal an individual's right to carry on private activities within the interior of a home or office, free from unreasonable governmental intrusion. [Citations.]" (*Cook, supra,* 41 Cal.3d at pp. 378-379.)

In this case, it is the traditional sanction of the outdoor area adjacent to the home—rather than the home itself—which the majority place at risk. In *Cook,* this court recognized the "high privacy interest in the 'curtilage' of a residence . . . ." (*Id.,* at p. 379.) *Cook* also noted the recent holding of the United States Supreme Court that the curtilage "'has been considered part of [the] home itself for Fourth Amendment purposes. . . .'" (*Id.,* at

p. 380, quoting *Oliver* v. *United States* (1984) 466 U.S. 170 [80 L.Ed.2d 214, 104 S.Ct. 1735]; see also *California* v. *Ciraolo* (1986) — U.S. — [90 L.Ed.2d 210, 221, 106 S.Ct. 1809, 1816] (dis. opn. of Powell, J.).)

Even before *Oliver,* lower federal courts had viewed the home and curtilage as equivalent for purposes of Fourth Amendment analysis. (See *United States* v. *Molkenbur* (8th Cir. 1970) 430 F.2d 563, 566 ["the curtilage . . . is entitled to the same protection as the home against search and seizure"]; *Wattenburg* v. *United States* (9th Cir. 1968) 388 F.2d 853, 857 ["[t]he protection afforded by the Fourth Amendment, insofar as houses are concerned, has never been restricted to the interior of the house, but has extended to open areas immediately adjacent thereto"]; *Rosencranz* v. *United States* (1st Cir. 1966) 356 F.2d 310, 313 ["[the Fourth Amendment] speaks of the 'houses' of persons, which word has been enlarged by the courts to include the 'curtilage'"].)

Appellant's 40-acre parcel is located in rural Humboldt County. The prosecutor indicated that the "area [was] once [a] sheep or cattle ranch and is now being subdivided into forty-acre plots . . . for residential purposes." The property contains 2 residences located 40 to 50 feet apart. The marijuana gardens were approximately 200 feet from the nearest dwelling. Another residence surrounded by several outbuildings is located on a neighboring parcel a relatively short distance from appellant's residences. This second residence is clearly visible in the aerial photographs taken during the overflight.

Despite the majority's suggestions to the contrary, the record reveals that the aerial inspection of appellant's home and surrounding area was quite detailed. On July 23, 1980, Agent Brown, Detective Vulich and a pilot flew south from Eureka toward Garberville looking for marijuana cultivation. According to Agent Brown, when the plane "just happened to fly over [the Mayoff property]," the officers began examining the ground for "indicators" of illegal cultivation. Detective Vulich testified that he observed the two residences on defendant's property, noting that they appeared to be "inhabited structures." He also observed that one was a larger mobilehome with a light-colored roof and he estimated its square footage. Further, he examined the paths leading from the residences to the suspect gardens to see if there might be any possible indication of marijuana cultivation.

Agent Brown examined the two residences on the property. One of the residences was a mobilehome with a wooden addition built on and the other was a smaller trailer located just down the road. The first indication of possible marijuana cultivation were "the paths leading . . . from the residence to the garden sites. . . ." He observed that the gardens were planted

in uniform rows and noted their distance from the residence. Agent Brown admitted that his surveillance "encompass[ed] quite a bit . . . ." This admittedly purposeful surveillance of the curtilage belies the majority's characterization as an unavoidable or inadvertent glimpse of the residences.

On August 4, 1980, Detective Vulich returned to the skies over appellant's property, again without a warrant. During this second surveillance, he took numerous photographs, not only of the suspected marijuana gardens but also of appellant's residences and their adjacent lands. Vulich photographed the neighboring farmhouse and its curtilage with an 80-200-millimeter telephoto lens.[2]

The record also makes clear that scrutiny of the curtilage is essential to the aerial identification of marijuana even when the suspect garden technically lies outside of the curtilage. The two officers participating in the surveillance of appellant's property had been trained in aerial marijuana identification and had a combined total of almost 20 years in making such identifications. Both officers admitted that from the altitudes maintained marijuana plants could not be distinguished from other plants which might be found in a typical vegetable garden.

The officers were able to form an opinion about the nature of the plants only by reference to external "indicators." Three of the four primary indicators the officers were trained to look for require an inspection of the curtilage. In addition to "row-like" planting and/or the color of the garden, the proximity of the residence to the garden, the presence of pathways leading from the residence to the garden and the presence of water storage were taken into account. Thus, contrary to the majority's suggestion, it appears that an *intensive* inspection of the curtilage was a prerequisite for establishing probable cause to validate the later ground search.

A fundamental problem with the majority's analysis is that it assumes that the "principal focus" of the surveillance in this case was confined to open fields. (Maj. opn., *ante,* at p. 1308.) The state has never suggested

---

[2]The majority argue that the photographs indicate that the "details of human activity could scarcely have been discernible from the aircraft." (Maj. opn., *ante,* at p. 1316.) This is somewhat misleading. Two aerial photographs are part of the record on appeal. Testimony below revealed that one of these photographs was taken at an altitude "a lot higher" than the other. The photographs bear out this assertion. We do not know the altitude represented by the lower photograph and have no idea whether it was taken from the lowest altitude flown during the surveillance of appellant's property.

Reference was also made below to several other photographs which are not included in the record on appeal. We do not know what these photographs portrayed. Finally, the majority overlook the testimony suggesting that the officers were able to observe appellant's property in great detail, as well as the testimony that people are clearly visible during the surveillance flights.

that the surveillance program is limited to open fields. Instead, it argues that aerial surveillance of all lands—curtilage and field—is constitutionally permissible.[3]

It is clear from the aerial surveillance cases before us that the majority's characterization of the surveillance program does not comport with reality. This court recently granted review in several cases involving aerial surveillance. The most distant gardens in these cases were found 200 to 300 feet from the residence. (*People* v. *Kramer* (Cal.App.) hg. granted Mar. 22, 1984 (Crim. 23607); *People* v. *Agee* (Cal.App.) hg. granted May 24, 1984 (Crim. 23738).) In another case, a few marijuana plants were found in vegetable gardens within 20 feet of the home, and more were found next to a swimming pool and greenhouse—clearly within the immediate curtilage. (*People* v. *Liondakis* (Cal.App.) hg. granted May 31, 1984 (Crim. 23752).) In still another case, the officers spotted a few marijuana plants in a small roofless greenhouse located next to the residence in an enclosed backyard (*People* v. *Fitzgerald* (Cal.App.) hg. granted May 24, 1984 (Crim. 23736).) In all but one of these cases, the gardens appear to have been relatively small in scale.

It is apparent, then, that the focus of the officers' attention was wherever they happened to spot areas of lush green vegetation which might be indicative of marijuana cultivation. In this case, that location happened to be an area 200 feet from the nearest sign of human habitation. In other cases, the suspicious vegetation—and therefore, the focus of police attention—was as near as 20 feet from an apparently inhabited dwelling or in an enclosed backyard. There is absolutely no evidence to support the majority's assertion that the focus of police surveillance excluded curtilage areas.

Further, the majority completely ignore the extensive testimony regarding the nature of the aerial surveillance program operated in Humboldt County. The program is conducted from June through November of each year. The flyover program covers virtually the entire county outside of the municipal areas of Eureka, Arcata and Fortuna.[4] The officers "terrace" or survey an area by flying in a zigzag fashion, "looking constantly" at the ground. The

---

[3]This explains in part why the trial court testimony simply does not square with the majority's view of a program of "limited surveillance." The prosecution never sought to establish that the program was restricted to open fields or that the surveillance did not encompass the curtilage. Rather, the prosecution's witnesses freely admitted that they inspect residential property for evidence of criminal activity. Even the prosecutor elicited testimony inconsistent with the majority's characterization of the program.

[4]Although municipalities are not included in the surveillance program, the officers admitted that it is impossible to avoid observing yards from the air. Indeed, marijuana gardens have been identified even in cities.

area surveyed is not limited to open fields; towns and communities are "searched" as well.

When the officers "see something that [they] think may be suspicious" they begin circling to inspect the area in greater detail and sometimes fly at a lower altitude. During this process, they examine nearby residences and the areas surrounding them. From the air, they are able to observe people and vegetable gardens planted "fairly close" to homes. The officers also examined residences and curtilages from the air even when they observed no marijuana gardens in the vicinity. None of the officers indicated that they made any attempt to avoid examining homes or adjacent yards.

Despite substantial evidence indicating the general intrusiveness of the program the officers' admission that they conducted a *purposeful* examination of appellant's curtilage, the majority conclude that the random surveillance did not constitute a search under either the federal or state Constitutions. I strongly disagree. The aerial surveillance of appellant's property clearly violated our state Constitution.

The police had no prior information regarding marijuana cultivation on any property. They were flying over and indiscriminately examining the ground for marijuana gardens. When appellant's property came within sight, the officers surveyed that area. Flying at 1,000 feet, they examined appellant's curtilage and fields for evidence. The police returned to the property on a second occasion, again flying at 1,000 feet, and extensively photographed the residences and the curtilages.

The majority conclude that the police conduct did not implicate appellant's privacy interests. The majority distinguish *Cook, supra,* 41 Cal.3d 373 by the fact that here, the marijuana garden was found outside the curtilage (see maj. opn., *ante,* at pp. 1307, 1316; but see *ante,* fn. 1), while the marijuana garden in *Cook* was observed inside the curtilage. (*Cook, supra,* 41 Cal.3d at p. 378.) The majority's theory is that "the open fields doctrine provide[d] an initial justification for the officers' airborne presence." (Maj. opn., *ante,* at p. 1317.) Because the police investigation "focused" on an area 200 feet from the residence and "merely notice[d]" the relationship of dwellings to the focused area, the surveillance was not objectionable. (*Id.,* at p. 1317.) The majority indicate, however, that scrutiny of the curtilage "for the particular purpose of confirming a suspicion that criminal activity is taking place there," remains unconstitutional. (*Id.,* at p. 1316.)[5]

---

[5]Each of the other facts cited by the majority to support their finding that the surveillance was permissible was present in the surveillance of the Cook property. Here, they explain,

Even under the majority's own test, one would have to conclude that the surveillance in this case was unconstitutional. As the uncontroverted testimony of the two airborne officers establishes, they examined the area surrounding appellant's home *for evidence of criminal activity.* The fact that the officers failed to find marijuana inside appellant's curtilage does *not* make the scrutiny of that area any less purposeful.

It cannot be disputed that the officers' inspection of appellant's curtilage was at least as intrusive as the inspection in *Cook, supra,* 41 Cal.3d 373. The infringement of appellant's "high privacy interest" in his curtilage was no less invasive even if one were to assume that the purpose of this inspection was only to confirm a suspicion of marijuana cultivation in a field. However, the majority overlook this simple truth by once again examining the issue through a "zones-of-privacy" approach. Under the majority's reasoning, protection from government intrusion depends not on the extent to which legitimate privacy expectations are infringed, but on the zone in which the contraband is discovered. If found in a zone of "diminished privacy," then the intrusion upon other zones becomes, to use the Attorney General's term, "irrelevant."[6]

In *Cook,* this court recognized that the concept of protected zones has little meaning when it comes to aerial surveillance. "Purposeful surveillance from the air simply lays open everything and everyone below—whether marijuana plants, nude sunbathers, or family members relaxing in their lawn chairs—to minute inspection. The usual steps one might take to protect his privacy are useless." (*People* v. *Cook, supra,* 41 Cal.3d at p. 382.)

The majority's unprecedented conclusion, that random aerial searches can be "focused" to detect illegal crop cultivation without infringing upon "innocent activities occurring within a legitimate zone of protected privacy" (maj. opn., *ante,* p. 1317), flatly ignores the reality of indiscriminate surveillance. At the same time the majority urge the aerial police to avoid scrutiny of the curtilage, they restrict their flights to altitudes from which the officers admit they are unable to identify marijuana cultivation without reference to the curtilage.

---

the property was located in a rural area (maj. opn., *ante,* at p. 1309); in *Cook* it was located in a semi-rural area (41 Cal.3d at p. 377). Here, they note, the plane flew over the property on only two occasions (maj. opn., *ante,* at p. 1309); in *Cook* only one overflight occurred (41 Cal.3d at p. 377). Finally, here, the plane maintained an altitude of over 1,000 feet during each flight (maj. opn., *ante,* at p. 1316); in *Cook* the plane maintained an altitude of at least 1,600 feet (41 Cal.3d at p. 377).

[6]Presumably the majority would have upheld the surveillance in *Cook* had the officers discovered during the overflight that the marijuana was actually growing not in Mr. Cook's yard, but in an adjacent field. Under the majority's analysis, even though the intrusiveness of the surveillance would have been the same, the location of the discovery would have rendered the overflight constitutional.

Even if the officers wanted to "focus" their attention only on open fields, it should be obvious that any such attempt would be futile in a program of systematic, indiscriminate surveillance of private lands from the air. To implement the majority's requirement, the officers will be required to examine an area first in order to determine if it is off-limits. This will be particularly problematic in this present context since broad curtilages surround many rural homesteads and it is difficult to determine the outer boundaries of private property.

Today's ruling all but abolishes the constitutional protection recognized in *Cook* for residents of rural and semirural counties. In its place, these residents are left with the illusory protection of a requirement that law enforcement officials "focus" their attention on open fields during random overflights of the residents' homes and yards. Nothing in the majority opinion prohibits plain view observations of activities within curtilage areas, so long as the observer's attention is "focused" on a nearby open field.

As one commentator observed, the right to be free from unreasonable searches "protects not against incrimination, but against invasions of privacy—or rather . . . of the right to maintain privacy without giving up too much freedom as the cost of privacy. The question is not whether you or I must draw the blinds before we commit a crime. It is whether you and I must discipline ourselves to draw the blinds every time we enter a room, under pain of surveillance if we do not." (Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 403 [hereafter *Fourth Amendment*].)

The constant threat of surveillance during random overflights will require individuals "to erect opaque cocoons within which to carry on any affairs they wish to conduct in private, and the concomitant chill such a requirement [will] place on lawful outdoor activity, [is] inimical to the vision of legitimate privacy which underlies our state Constitution." (See *Cook, supra,* 41 Cal.3d at p. 377.)[7]

Random surveillance is nothing more than an exploratory search, i.e., an effort to discover evidence of criminal activity undertaken without a warrant, probable cause or even particularized suspicion. Such searches are viewed with profound disfavor precisely because they threaten the security of the law-abiding as well as the lawbreaker, chilling the legitimate activities of the innocent as well as the illicit schemes of the guilty. (See, e.g., *People*

---

[7]This case illustrates how the random surveillance program can infringe upon the privacy rights of the innocent. In the course of the surveillance of this area, the officers unavoidably intruded upon the homestead adjacent to the Mayoff property, as to which there was no suspicion of criminal activity.

v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232]; *Bielicki v. Superior Court* (1962) 57 Cal.2d 602, 606 [21 Cal.Rptr. 552, 371 P.2d 288], citing *People* v. *Schaumloffel* (1959) 53 Cal.2d 96, 100-101 [346 P.2d 393]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 378-379 [303 P.2d 721]; *People* v. *Mills* (1957) 148 Cal.App.2d 392, 399-401 [306 P.2d 1005].)[8]

Nevertheless, the majority claim such invasions of personal privacy are necessary to advance the significant law enforcement objectives at stake. I cannot agree. It is possible to serve the legitimate governmental purposes of the surveillance program without sacrificing the privacy rights of our citizens who live in areas where there will be indiscriminate police surveillance.

Many of the counties subject to random aerial surveillance programs contain vast areas of public lands. The Attorney General asserts that a substantial proportion of the marijuana cultivation occurs on such lands. Also, there is evidence that marijuana growers are increasingly reacting to the aerial surveillance programs by moving their operations to public lands in order to avoid detection. The impact of marijuana cultivation on the users of public lands, such as "hikers, campers, fishermen, and hunters," is a significant governmental objective of the surveillance program cited by the majority. (*Ante,* p. 1308, fn. 2.) The majority state that the transformation of rural areas "formerly open to recreational use into illegal armed camps

---

[8]The searches conducted in colonial America under the general warrants and the writs of assistance are regarded as "one of the primary causes of the American Revolution" and the inspiration for the constitutional prohibition against unreasonable searches and seizures. (Schaefer, *Aerial Surveillance and the Fourth Amendment* (1984) 17 J. Mar. L.Rev. 455, 460; see also *Fourth Amendment, supra,* 58 Minn.L.Rev. at pp. 363, 366.) "[T]he primary abuse thought to characterize the general warrants and the writs of assistance was their indiscriminate quality, the license that they gave to search Everyman without particularized cause . . . ." (*Fourth Amendment, supra,* 58 Minn.L.Rev. at p. 366.) " '[W]arrants lacking strict particularity as to location to be searched or articles to be seized were deemed obnoxious' because of the root principle stated by Lord Mansfield: that '[i]t is not fit, that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge; and should give certain directions to the officer.' The power asserted by the English messengers and colonial customs officers and condemned by history was 'a discretionary power . . . to search wherever their suspicions may chance to fall,' 'a power that places the liberty of every man in the hands of every petty officer.'" (*Id.,* at p. 396, fns. omitted.)

Today, the sound of English messengers at the doorstep has been replaced by the drone of the police surveillance plane. As with the general warrants, a dangerous consequence of indiscriminate aerial surveillance is the intrusion on the privacy of citizens without particularized cause. As the testimony in this case proves, the surveillance officers examine an area in detail whenever their glances fall on "something [they] think may be suspicious." The officers have unfettered discretion to decide whose privacy will be invaded. These parallels to colonial times are especially significant since these very characteristics of the general warrants and writs of assistance led to the enactment of the Fourth Amendment and in no small measure inspired the creation of this democratic society.

posing a danger to innocent wanderers is a major social and environmental problem which itself implicates precious personal freedoms." (*Ibid.*)

A program of random aerial surveillance could be operated in conformity with constitutional principles if restricted to publicly owned lands where there generally would be no infringement upon the elevated privacy rights of any residences or any curtilage areas surrounding residences. Aerial surveillance of specific privately owned fields could be permitted to confirm reports of marijuana cultivation. In view of the unique problems identified by the Attorney General, this latter surveillance might be allowed on the basis of a reasonable and particularized suspicion. A program restricting indiscriminate surveillance to public lands and allowing site-specific searches of private fields on less than probable cause, would permit law enforcement agencies to survey a substantial portion of the area of suspected cultivation and would also serve to combat any danger to recreational users of the land. Such a program would at the same time protect the legitimate privacy rights of our innocent citizens living in our rural counties.

The inquiry in any search and seizure case should be "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." (*Fourth Amendment, supra,* 58 Minn.L.Rev. at p. 403.) The procedures at issue here "too closely resemble[] the process of the police state, too dangerously intrude[] upon the individual's reasonable expectancy of privacy, and thus too clearly transgress[] constitutional principle" to be left substantially unregulated. (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 629.)

By permitting indiscriminate aerial surveillance, the majority effectively limit the traditional sanctity of residential property to the area enclosed by the four walls of the dwelling house. Such a holding is inconsistent with those principles which separate our open and democratic society from societies in which the government may spy on its citizenry unfettered by the rule of law.

Respondent's petition for a rehearing was denied January 29, 1987.